SULLIVAN *v.* PLAYFAIR REALTY CO.

1. COVENANTS—BUILDING RESTRICTIONS—VESTED RIGHTS.
The purchaser of lots in a subdivision originally adver-
tised and sold by the owner as a high-grade exclusively
residential district, did not obtain vested rights to use
said lots in violation of said restriction, which had been
put into the original contracts, although when resold to
him by the owner, who had taken them back from the
original buyer, said restriction was omitted, where, in the
meantime, the restriction had been observed, and the sub-
division had developed into a high-grade residential one.

2. SAME—EASEMENTS—LIFTING RESTRICTION—NOTICE.
The owner of a subdivision platted and sold as a high-
grade exclusively residential district may not, by buying
back certain of the lots and reselling them to another
without the restriction, lift the reciprocal easement im-
pressed upon them, either as to himself or any one else
with notice thereof.

3. SAME—BUYER SHOWN TO HAVE HAD CONSTRUCTIVE NOTICE OF
RESTRICTION.
Evidence *held*, sufficient to show that the buyer of lots
in a strictly residential district had constructive notice of
the character of the district, although the restriction limit-
ing to residential purposes was omitted from his contract
and deed.

4. SAME—PROPERTY OWNERS DIRECTLY INTERESTED ENTITLED TO
ENJOIN VIOLATION OF RESTRICTION NOTWITHSTANDING VIOLATION
ELSEWHERE ON SUBDIVISION.
Property owners are entitled to enjoin the violation of
building restrictions on the street on which they live and
are directly interested, notwithstanding violations else-
where on the subdivision which did not infringe on their
welfare or the peaceable enjoyment of their homes and
property.

Appeal from Wayne; Webster (Arthur), J.     Sub-

[1]Deeds, 18 C. J. § 459 (Anno); 34 L. R. A. (N. S.) 730; 2
R. C. L. 1209; 1 R. C. L. Supp. 745; 4 R. C. L Supp. 161; [2]Id.,
18 C. J. § 459 (Anno); [3]Id., 18 C. J. § 463; 16 A. L. R. 1013;
[4]Id., 18 C. J. § 465 (Anno).

mitted January 20, 1926.    (Docket No. 85.)    Decided January 3, 1927.   Rehearing denied April 1, 1927.

Bill by John D. Sullivan and others against the Playfair Realty Company and others to restrain the violation of building restrictions.    From a decree dismissing the bill, plaintiffs appeal.    Reversed, and decree entered for plaintiffs.

*Oscar A. Kaufman* (*Frank C. Sibley,* of counsel), for plaintiffs.

*Lucking, Hanlon, Lucking & Van Auken,* for defendants.

STEERE, J.    Plaintiffs have appealed from a decree of the Wayne county circuit court, in chancery, dismissing their bill filed to restrain defendants from erecting a two-story public garage and store building on the southwest corner of Lawrence avenue and Twelfth street in the so-called "Clements & Oakman subdivision of the south 20 acres of the southeast quarter of quarter section 27, 10,000-acre tract, Greenfield township, Wayne county, Michigan," now within the northwest confines of the city of Detroit.    When platted by Robert Oakman in 1910 it was unoccupied farm land.    Shortly after platting this subdivision, he put it on the market as a high-grade exclusively residential suburban district.    It is bounded on the easterly end by Twelfth street, on the north and south sides by alleys, and on the west end by a tract called "Roosevelt field."    In dimensions it is a trifle over 1,300 feet long east and west with a width of about 650 feet.    It was so planned and platted that Lawrence and Collingwood avenues, which then ran west from Woodward avenue to Twelfth street only, could most advantageously be continued westward through it as they were.    All the 172 lots in the subdivision

front on those two avenues with an alley at the rear. Both avenues are 60 feet wide. Lawrence avenue lies north of Collingwood, having a row of lots fronting its north side with the north boundary alley at their rear, on the south side of Collingwood a similar condition exists with the south boundary alley at the rear of the row of lots fronting on it. Between the two avenues are two rows of lots, one row fronting on each avenue with an east and west alley at their rear extending the entire length of the subdivision. All lots in the subdivision are practically 30 feet wide except eight and the widest of these is 41.9 feet. All lots are numbered consecutively except the four which side on Twelfth street. These four are each 33 feet wide and marked respectively A, B, C, and D.

After the subdivision was platted and recorded by Oakman and wife, he put on a well-advertised sale campaign with salesmen for a time in attendance upon the ground distributing literature, etc. On the back of a then-circulated map appears, among other things, the following laudatory description of the subdivision:

"This property is admirably situated for high-class home sites. It is immediately adjoining the Boston boulevard section, North Woodward's most exclusive residence location, and is the only moderately priced property available in this district. The subdivision comprises the extension of Collingwood and Lawrence avenues west of Twelfth street, and the high standard of these streets from Woodward avenue will be maintained throughout. * * * It is in the highest and most healthful part of Detroit, sufficiently removed from the manufacturing districts to afford freedom from smoke and noise, * * * Twelfth street is the only continuous thoroughfare, except Woodward avenue, running from the river without jog or interruption to the limits of the Ten Thousand Acre Tract." * * *

A form of restriction was adopted and as a rule embodied in the deeds and contracts of purchasers of

lots in that subdivision.     As applied to Lawrence
avenue, it reads:

"Said lot shall be used solely for residence purposes.
No building, the cost of construction of which is less
than $6,000 shall be erected upon said lot.     No build-
ing shall be erected nearer than 30 feet to the front
line of said lot, nor nearer than three feet to the west
line thereof, nor nearer than four feet to the east line
thereof."

On June 11, 1914, Oakman sold to a man named
Gustave W. Meyer eight lots on Lawrence avenue at
the east end of the subdivision, four on each side of
the avenue, including lots C, 85, and 86 in controversy
here, giving him a printed booklet form contract con-
taining a subhead "Restrictions" in large-sized type,
followed by:

"Said lots shall be used solely for residence pur-
poses.     No building the cost of construction of which
is less than $3,000 shall be erected nearer than 30
feet to the front line of said lot, nor nearer than two
feet to the west line of same, nor nearer than four
feet to the east line thereof."

On November 11, 1915, Meyer surrendered or re-
leased from this contract his interest in lots C, 85,
86, and 87 in exchange.for a corner lot in another sub-
division.     He retained under his contract and paid
in full for the four lots on the opposite corner but
up to the time of the trial had been unable to obtain
the kind of deed he wanted from Oakman.     He ex-
plained that a salesman of Oakman asked him to sur-
render the four lots on the southeast corner in ex-
change for a corner in another subdivision because he
had "promised one of the Oakman family that corner,"
and the only reason he could give for complying was
his "kind heartedness  *  *  *  to help Mr. Allen out
of a hole."     In that connection he offered the apolo-
getic reflection that he "was kind of green those days
in real estate business.  *  *  *  I made the trade,

paying, I think, $60 more for it. * * * I made a holler about it, but I let it go because I didn't want to create any trouble."

Having thus gotten the property back, Oakman promptly proceeded to sell lots C, 85, and 86 again for an increased price under contract dated November 22, 1915, to one James H. Gregg free of residential restraint, his restrictions under that subhead being, as defendants' counsel state in their brief, similar to those contained in the deed which he later gave defendant, read into the record as follows:

"Party of the second part shall erect no building on the above-described lot nearer than 15 feet to the north line thereof, and shall erect no building thereon except it be of brick or stone construction; provided, however, that the sides of the building fronting on Twelfth street and on Lawrence avenue shall be of pressed face brick."

This contract passed by assignments through the hands of three different owners, who made no attempt to build upon any of the lots, until in 1922 Dr. Samuel J. Herman, who lives "on Lawrence avenue between Second and Third," then acquired the contract and obtained a deed of the property to his company containing the same restrictions as in the contract.

The Playfair Realty Company is a family corporation, most of the stock belonging to Dr. Herman and his wife. Of it he said: "I managed the affairs of the Playfair Realty Company and have done so since the beginning." Asked: "How long have you been in the real estate business under the name of Playfair Realty Company or your wife and you?" he replied, "I think about four or five years." His claim and attitude in this litigation is that when he purchased the property in 1922 for his company neither he nor it knew of any restrictions upon the subdivision except that contained in its deed, and the two-story garage he proposed to build covering the whole three

lots, with stores on Twelfth street, to within 15 feet of the Lawrence street line at the front of those lots, did not violate the restrictions of his deed.

Had he or his predecessor in title bought those lots from the platter when this subdivision was vacant and undeveloped, without other notice than the restrictions in their contract, and thereby acquired a vested right, of which subsequent conveyances of other lots in and development of the subdivision could not divest them, that contention might be tenable. But the principle of previously vested rights is not applicable to the undisputed facts in this case, and the authorities cited in support of it are not in point. The distinction is pointed out in the authorities cited and need not be reiterated here.

When Dr. Herman and his predecessors bought these lots from Oakman, this subdivision had developed into an improved, populous, high-grade residential district in harmony with the plan and purpose for which it was advertised and exploited by the platters from the beginning, ostensibly sold to those desiring "high-class home sites" in a "most exclusive residence location." These very lots were first so stamped and sold under residence restrictions by Oakman, and as late as April 4 and 21, 1924, in answer to inquiries directed to him at his office by plaintiff Sullivan, he advised that these lots were to "be used solely for residence purposes, and no building shall be erected nearer than thirty (30) ft. to the front line of said lot." Oakman was not a witness in the case and we are not favored with his explanation of those transactions, but an employee from his office testified the letters were mistakenly written.

So far as this record discloses, all lots in this subdivision on Lawrence avenue as sold by the platter and common owner were originally sold subject to residential restrictions, including the lots in question.

No violations of those restrictions by the many purchasers who bought, built, and established their homes there are shown since the property was platted.   No juggling of the platter by buying these lots back and selling them again without restrictions could lift the reciprocal easement impressed upon them, either as to himself or any one else with notice (*Sanborn* v. *McLean*, 233 Mich. 227).

The proof is abundant that Dr. Herman had ample notice to at least put him on inquiry.   He was extensively engaged in the real estate business, managing a corporation organized for that purpose, was looking around for real estate investments, resided upon Lawrence avenue, though some distance away, and testified that he was familiar with real estate prices in that locality.   Lawrence avenue had developed into a well-improved residential street at that time, occupied by many private homes built in compliance with the restrictions generally adopted, set back on each side 30 feet from the street line, leaving a space of 120 feet between the rows of houses along the avenue. The homes are shown to be attractive and substantial, costing from $15,000 upwards, with an average value of $20,000, as testified by one of the witnesses.   The manifestly residential character given the avenue in that section by the expensive residences thereon uniformly lined well back on their lots would seem to be indicative of a general plan sufficient to put an experienced real estate dealer on inquiry.   The actual occupation and personal possession of their lots by those home owners was constructive notice of their rights and interest in them, whatever they were.   The testimony shows that lots platted on streets for business purposes in the city of Detroit are as a rule but 20 feet wide and platters of subdivisions intending any portion for business purposes customarily front proposed business lots of that width on an-

ticipated business streets.    It was shown Oakman had done so in some of his platting.    The lots in question here were 30 feet or more wide, all fronting on Lawrence avenue and parallel to Twelfth street.    This the doctor must have known if he knew what he was buying, and he realized that in order to get a business site of value fronting on Twelfth street he must buy lots enough to obtain the required depth.    We are of opinion this record amply shows constructive notice.

Plaintiffs here are only directly interested in Lawrence avenue and entitled to protection under the restrictions as to it, even though there may have been some violation elsewhere in the same subdivision which did not infringe on their welfare or the peaceable enjoyment of their homes and property.    This two-story garage as planned and where proposed to be built, on the corner of Twelfth street and Lawrence avenue, can well be said to approximate a dangerous nuisance. The testimony shows that at the time it was projected there were some 75 children living upon Lawrence avenue between Twelfth street and Roosevelt field, where a schoolhouse was in process of construction. Its plans show it will cover the three lots which face on Lawrence avenue, extending 15 feet nearer its street line than any other building along it in that subdivision.    Its double main entrance with 10-foot doors is planned to be located around the corner from Twelfth street on Lawrence, one entrance leading to a ramp reaching to the second story.    Such a situation would not only partially bottle up Lawrence avenue from Twelfth street but seriously detract from the comfort, convenience, and safety of residents on that avenue with the large number of children shown to live in that vicinity.    The testimony of professional and business men living upon Lawrence avenue shows that the depreciation in value of residence property located along it resulting from the erection of this garage

would be acute and substantial, amounting to many thousands of dollars. In so far as the equities are involved, they are not with defendants.

We conclude that under the facts disclosed this case is controlled in principle by the rules recognized in *McQuade* v. *Wilcox*, 215 Mich. 302 (16 A. L. R. 997); *Sanborn* v. *McLean*, 233 Mich. 227, and the cases therein cited.

The decree dismissing plaintiffs' bill is reversed and a decree may be entered herein granting the relief asked, with costs to plaintiffs.

SHARPE, C. J., and FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred. BIRD and SNOW, JJ., did not sit.