### KISKADDEN *v.* BERMAN.

1. COVENANTS—BUILDING RESTRICTIONS—INTENT.

   Whether the owner of a subdivision and the owners of lots therein, who signed an agreement to restrict the lots on a certain street to single residences only, which at the time were the only ones salable, intended to restrict all the lots in the subdivision, is to be gathered not only from the agreement itself, but also from the conditions existing at the time.

2. SAME—INTENT TO RESTRICT ALL LOTS IN PLAT.

   The signing of an agreement by the owner of a subdivision and owners of lots therein restricting the lots on a certain street to single residence purposes only, under the conditions then existing, which tend to show that the restriction was placed on said lots for the benefit of the remaining lots, followed by the inclusion of the restriction in later conveyances, *held,* to evidence an intention of following a general single residence building plan for the entire plat.

The question as to whether the erection of multiple residence structures is violation of restrictive covenants, see annotation in 45 L. R. A. (N. S.) 726; L. R. A. 1918 C, 873; 18 A. L. R. 451.

3. SAME—BUILDING RESTRICTIONS—RECIPROCAL NEGATIVE EASEMENT—EQUITY.

> Where the plan of one single residence for each lot, as evidenced by an agreement signed by the owner of the subdivision and owners of lots therein, was adhered to in subsequent conveyances by the plat owner, and in every instance was followed by the purchasers, who bought their lots and built their homes with the assurance that the same restriction attached to all other lots, equity will imply mutual reciprocal rights, which one grantee may enforce against another grantee, either upon the theory that there is a mutuality of covenant and consideration, or upon the ground that mutual negative equitable easements are created.

4. SAME—RECIPROCAL NEGATIVE EASEMENT GOES WITH LAND, ALTHOUGH NOT MENTIONED IN DEED.

> A mutual negative easement in the nature of a building restriction goes with the land, and therefore attaches to lots subsequently conveyed, although the conveyance contain no restriction.

5. SAME—NOTICE.

> Where the owners of lots, bought before the subdivision was platted, joined with the owner of the subdivision after it was platted in an agreement restricting the lots on a certain street to single residence purposes for the benefit of the whole plat, which plan has since been followed by the purchasers in every instance, the restriction attaches and is binding on their grantee, who is held to have purchased with notice, although the conveyance to him contained no restriction.

6. SAME—LACHES—INJUNCTION.

> Where work on the foundation of an apartment house was begun on November 1st, other lot owners in the subdivision, claiming a violation of the building restrictions, employed an attorney on the 25th, and a bill to restrain the erection of said building was filed on December 16th, it cannot be said that right to relief is barred by laches.

Appeal from Wayne; Merriam (De Witt H.), J. Submitted April 17, 1928. (Docket No. 127, Calendar No. 33,703.) Decided October 24, 1928.

Bill by Donald S. Kiskadden and others against William Berman and others to enjoin the violation of building restrictions. From a decree for plaintiffs, defendant Berman appeals. Affirmed.

*Maurice H. McMahon,* and *Prentis, Pugh, Fitch & Carpenter,* for plaintiffs.

*Friedman, Meyers & Keys,* for appellant.

McDONALD, J. This bill was filed to enjoin an alleged violation of certain building restrictions. The property involved has a frontage of 193 feet on the north side of Eason avenue between Woodward and Second avenues in the city of Highland Park, Wayne county, Michigan, and comprises the easterly 43 feet of lot 90, and all of lots 91, 92, and 93 of Grove Lawn subdivision. Esther A. Eason was the original owner of all the land contained in this subdivision. Prior to platting, she conveyed the lots involved in this litigation by several warranty deeds without restrictions to Anna M. Joyce, Jesse M. Smith, and John H. Eason. Subsequently they joined with her in the execution of the plat which was also without restrictions. The plat was recorded December 7, 1905. The property remained undeveloped until 1907. At that time there was considerable activity on Woodward avenue due to the location of the Ford Motor Company plant in that vicinity. There were 26 lots of the Grove Lawn subdivision fronting on the west side of Woodward avenue. Most of them belonged to Esther A. Eason. She and all of the other owners joined in an agreement to restrict the Woodward avenue lots to single residence buildings. This agreement was made on the 24th of January, 1907. Following this, in 1909, Esther A. Eason replatted that portion of Grove

Lawn subdivision north of Eason avenue, and, including other property, made a new subdivision known as Eason's Palmer Park subdivision. She sold that portion lying south of Eason avenue to the Highland Park Land Company, and, including other land, it was replatted as the Medbury Park subdivision. The lots involved in this suit remained a part of the Grove Lawn subdivision. They are on the north side of Eason avenue. Development of the property began in 1912 and 1913, and as to the lots in Eason's Palmer Park subdivision and Medbury Park subdivision there seems to have been a general plan to restrict their use to single residences. Whether there was such a general plan as to the lots remaining in Grove Lawn subdivision is disputed. But most of the lots were sold with such a restriction. The owners have followed the restriction in the use of their lots and the entire district is now made up of fine single residences. The defendant Berman has acquired the easterly 43 feet of lot 90 and all of lots 91, 92, and 93 on the north side of Eason avenue, and proposes to build a large apartment house. The various conveyances of defendant's lots contain no restrictions as to single residences. The defendant says that they are not so restricted. The claim of the plaintiffs is that the signing of the agreement of 1907 restricting the Woodward avenue lots was the declaration by the owners of a general plan to restrict all lots in the subdivision to single residences; that they thereby created a reciprocal negative easement on all of the lots; and that these plaintiffs and others who have bought their lots relying on the restrictions have a right to insist that the defendant's lots are burdened with the same easement. On the hearing the circuit judge adopted the theory of the plaintiffs and en-

tered a decree restraining the construction of the apartment house. The defendant Berman has appealed.

The controlling question is whether there was a general plan to restrict the lots in Grove Lawn subdivision to single residences. Unless there was such a plan, the defendant's lots are not restricted. It may be, as claimed by the defendant, that the agreement of 1907 to restrict the use of the lots on Woodward avenue to single residences, in and of itself, does not establish a general building plan for the entire plat. But it must be conceded that it was the first step in that direction. The force and effect of that agreement on the remaining lots depends on the intention of the parties who joined in it. And in looking for the intention, we are at liberty to consider the agreement in connection with existing conditions at the time. By its terms the agreement relates only to restrictions on the Woodward avenue lots. And this leads counsel for the defendant to suggest that, if it were their intention to apply the restrictions to other lots, they would have said so in the agreement. The existing conditions probably explain why they did not do so. The only portion of the plat that was then at all suitable for business purposes was that fronting on Woodward avenue. The balance was nothing more than a barren tract of farm land, platted, but with no immediate prospect for development. Woodward avenue in that vicinity was developing into a business district. And it is fair to assume that if the owners had intended to devote any portion of the plat to business uses, they would have selected the lots on Woodward avenue, which were the only lots suitable for that purpose. All of the parties to the restriction agreement owned lots in the subdivision. Apparently all are deceased.

At least none of them appeared as witnesses. However, though their intention is not expressly stated in the agreement, there is no difficulty in ascertaining it with reasonable certainty from what they did and their purpose in doing it. They took no steps to restrict any portion of the plat until they discovered that Woodward avenue was approaching a business district. At that time, their lots fronting on Woodward avenue were the only salable lots in the subdivision. They would bring a better price without the restrictions, so, if the parties had not owned other lots in the plat, it would have been an injury rather than a benefit to them to restrict the Woodward avenue lots to a use for which they were not suitable. In the face of these facts, they applied the restrictions. That they did so for the benefit of their other lots is the only possible inference that can be drawn from these facts. Furthermore, after this restriction agreement of 1907, Esther A. Eason, who had platted the property and still owned all but a small number of the lots, sold a large number of them to the Highland Park Land Company, and in her conveyance recited that they were subject to the restriction contained in the agreement which she and others had signed in 1907 with reference to the Woodward avenue lots. This is rather convincing proof that the restriction was placed on the Woodward avenue lots for the benefit of the remaining lots and with the intention of following a general single residence building plan for the entire plat. This plan was adhered to in the subsequent sale of the lots and in every instance was followed by the purchasers, who bought their lots and built their homes with the assurance that the same restriction attached to all other lots. In such circumstances, equity will imply mutual reciprocal rights which one

grantee may enforce against another grantee "either upon the theory that there is a mutuality of covenant and consideration, or upon the ground that mutual negative equitable easements are created." 18 C. J. p. 394, and other cases cited.

This right of easement goes with the land and attaches to the lots of the defendant though his conveyance contains no restriction. It is true that they were conveyed without restrictions to the defendant's predecessors in title by Mrs. Eason before she platted the subdivision. But they joined her in executing the plat, and in 1907 signed the restriction agreement restricting the Woodward avenue lots to single residences for the benefit of the entire plat, thus including their lots within the general plan of development. In the hands of the then owners the lots were restricted to single residences. The restriction still attaches and is binding on the defendant, who must be held to have purchased with notice.

Laches. We are not favorably impressed with the merits of the claim that the plaintiffs are barred from relief by their laches. The defendant is an experienced realtor and builder. The lots on which he proposed to build a 62-family apartment house were entirely surrounded by high class single residences. He knew that there was a question as to restrictions. He knew that there were objections from his neighbors as to the building of an apartment house. Nevertheless, he hurried along and got the foundation in before his architect had time to complete plans for the excavation and obtain their approval by the city building department. He testified that he began work on the foundation about the 1st of November. The architect testified that plans for the foundation were approved about the 14th of November, and he was given permission to go ahead with

the excavation. At that time the excavation had been completed. The plaintiffs employed an attorney about November 25th. Several weeks were necessarily consumed in examining records in preparation for suit. The bill was filed on December 16, 1927. As to laches, the situation would be different if the plaintiffs had stood silently by in seeming acquiescence while the defendant expended money in excavating for the building. They did not do so, nor did they do anything to mislead him. Their right to relief is not barred by laches.

The circuit judge was right in restraining the erection of the proposed apartment building. His decree is affirmed, with costs to the plaintiffs.

FEAD, C. J., and NORTH, FELLOWS, WIEST, CLARK, POTTER, and SHARPE, JJ., concurred.