STARK *v.* ROBAR.

1. COVENANTS—RECIPROCAL NEGATIVE EASEMENTS.

Restrictions upon owners of lots in a subdivision, which limit the owners as to type or number of buildings that may be erected upon the lots, are known as reciprocal negative easements.

2. SAME—RECIPROCAL NEGATIVE EASEMENTS—GENERAL PLAN.

Reciprocal negative easements may be created upon a division of an entire tract and conveyance in severalty to different grantees and the fact that some of the conveyances do not contain the restrictions will not defeat the same, provided a general plan has been maintained from its inception that has been understood, accepted, relied on and acted upon by all in interest.

3. SAME—RECIPROCAL NEGATIVE EASEMENTS—NOTICE.

Lots burdened with reciprocal negative easements by a common owner remain burdened therewith when later sold to separate parties and the right to demand observance thereof passes to each purchaser with notice of the easement.

4. SAME—RECIPROCAL NEGATIVE EASEMENTS—ABSTRACT OF TITLE— CONSTRUCTIVE NOTICE.

The fact that a reciprocal negative easement fails to appear in chain of title to a lot will not prevent the lot from being

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 14 Am Jur, Covenants, Conditions and Restrictions §§ 199, 216.
[3, 6] 14 Am Jur, Covenants, Conditions and Restrictions § 321.
[4] 14 Am Jur, Covenants, Conditions and Restrictions § 330.
[5] 14 Am Jur, Covenants, Conditions and Restrictions §§ 321, 327.
[7, 9, 11] 14 Am Jur, Covenants, Conditions and Restrictions §§ 195, 196.
[8] 14 Am Jur, Covenants, Conditions and Restrictions §§ 217, 218.
[10] 14 Am Jur, Covenants, Conditions and Restrictions § 296.
[10] Acquiescence by purchaser of lot in restricted district in violations of restrictions as to some lots as waiver of right to insist upon it as to others. 46 ALR 372; 85 ALR 936.

burdened therewith, where the abstract of title shows that the lot while in the hands of a common owner was burdened with such an easement, as a subsequent purchaser is charged with constructive notice under the recording act.

5. SAME—RECIPROCAL NEGATIVE EASEMENTS—REPURCHASE BY SUB-DIVIDER.

A platter of a subdivision cannot lift reciprocal negative easements which have been imposed upon and observed by purchasers of lots through the device of buying the lots back and reselling them without restrictions.

6. VENDOR AND PURCHASER—VOLUNTARY SURRENDER OF VENDEE'S INTEREST.

A vendor who takes from his vendee a voluntary surrender of a land contract takes it subject to all the obligations assumed by the latter to third parties and is, therefore, obligated to perform his vendee's contract.

7. COVENANTS—RECIPROCAL NEGATIVE EASEMENTS—COMPLIANCE—EVIDENCE.

Common owner of land who sold it to subdivider under a land contract that was voluntarily surrendered by purchaser thereunder after some of the lots therein had been deeded by the common owner to lot purchasers subject to reciprocal negative easements clearly evidenced intent to comply with the vendee's covenants by later conveyances subject to restrictions of record.

8. SAME—RECIPROCAL NEGATIVE EASEMENTS—RESIDENCES—DESIGNATION OF LOTS USABLE FOR BUSINESS PLACES.

Clearly and unambiguously worded restriction that all lots, with certain exceptions not here involved, were "to be used for single-residence purposes only" was not limited or modified by later paragraph lodging right in subdivision owner to designate lots usable for salesrooms or business places.

9. SAME—RECIPROCAL NEGATIVE EASEMENTS—CREATION—EVIDENCE.

Claim that reciprocal negative easements were not created because they did not originate in a common owner or conform to a uniform plan *held*, contrary to the evidence presented by record in suit to enforce such easements.

10. SAME—RECIPROCAL NEGATIVE EASEMENTS—MINOR INFRACTIONS—ESTOPPEL—RESIDENCE RESTRICTIONS.

Minor infractions of restrictions by other lot owners do not preclude an owner of a lot in a subdivision whose lot is subject to reciprocal negative easements from objecting to

a major violation of a business structure on lots restricted for residential purposes.

11. APPEAL AND ERROR—DE NOVO REVIEW—RECIPROCAL NEGATIVE
    EASEMENTS—GENERAL PLAN—EVIDENCE.
        Record presented on *de novo* review in suit to enforce reciprocal
        negative easements *held,* to justify finding existence of a
        general plan of restrictions binding upon fee owners and
        defendants.

Appeal from Oakland; Doty (Frank L.), J. Submitted January 7, 1954. (Docket No. 28, Calendar No. 45,932.) Decided April 5, 1954.

Bill by Joseph A. Stark against Edward L. Robar and Clara Robar to enforce building restrictions. Cross bill to clear title of restriction. Decree for plaintiff. Defendants appeal. Affirmed.

*Howlett, Hartman & Beier* (*William B. Hartman,* of counsel), for plaintiff.

*Burton P. Daugherty* (*Glenn C. Gillespie,* of counsel), for defendants.

BUSHNELL, J. Plaintiff Joseph A. Stark is the president of Union Lake Highlands Association, an unincorporated association of owners of property in Union Lake Highlands, a subdivision located in Commerce township, Oakland county. He also is the owner of lots 99, 100 and 101. Defendants Edward L. Robar and Clara Robar, his wife, are owners of lots 23 to 26, inclusive, and lots 29 to 38, inclusive.

When the Robars commenced the construction of a commercial store building on lots 23 to 26, inclusive, Stark, individually and as representative of other lot owners, filed a bill in equity to enjoin claimed violations of the building restrictions. The Robars filed a cross bill in which they sought a decree quieting title and a determination that their property was

not subject to the claimed restrictions. They have appealed from a decree in which they were permanently enjoined from using the mentioned lots for other than residential purposes.

The plat of Union Lake Highlands was recorded on August 26, 1925. Prior thereto the property was owned by Fred D. Simpson and Mabel E. Simpson, his wife, and Mary R. Simpson, his mother, now deceased. On May 31, 1924, the Simpsons entered into a land contract for the sale of this acreage to William J. Dominique and Frances B. Dominique, his wife, in which is recited that:

"It is a condition of this agreement that the parties of the second part, their heirs and assigns, shall use the premises herein described for subdivision."

The property was subdivided into 114 lots by the Dominiques, and the Simpsons joined in the execution of the plat and in the dedication of the streets and alleys to the use of the public.

The Simpsons agreed that they would give a deed to any lot upon the payment on the land contract of twice the amount due on such lot. In furtherance of this agreement, 11 lots were deeded to the Dominiques during the period from 1926 to July 24, 1931, which contained no restrictions. The Dominiques subsequently deeded various lots to the other purchasers, in which restrictions were recited at considerable length, or to which reference was made. The first of these deeds, dated January 4, 1928, conveyed lots 1 to 5, inclusive, to Clayton R. Myers and wife. The pertinent portions of the restrictions are as follows:

"No 1. All lots to be used for single-residence purposes only with the exception of lots 1 to 22, 33 to 38, inclusive, and lot 114.   *   *   *

"No 3. No more than one building, except lots 1 to 22 and 33 to 38 inclusive, and 114 otherwise pro-

vided for, shall be erected on any one lot. Boat-houses shall be deemed to be within the term 'build-ing'. On all lots the garage must be erected as a part of the house on the lot. No old buildings, either in part or entire, shall be moved onto any lot; no sales-room or place for the transaction of business shall be erected or maintained on any lot excepting such lots as shall by the owner of said subdivision be designated for the purpose, which designation shall be included in the contract and in the deed therefor. No tents allowed on said subdivision."

In the Simpson deed on lot 51 to Dominique, dated July 24, 1931, and lot 96, dated January 21, 1932, is recited "subject to restrictions of record." From the last-mentioned date to April 29, 1941, Simpson conveyed 26 other lots to. Dominique by 13 deeds. Restrictions were mentioned in only 4 of these. No further conveyances were made to Dominique and all subsequent conveyances from Simpson were made directly to third parties.

Dominique defaulted on his obligations to Simp-son in 1932 and surrendered his land contract with-out any foreclosure proceedings and without a writ-ten assignment. Thereafter Simpson conveyed to others a total of 37 lots, deeds to 6 of them failing to mention restrictions. On May 17, 1951, Simpson conveyed the lots here in question to the Robars. Prior to this conveyance (August 14, 1943) Robar obtained title to 6 lots by conveyance, in which was recited, "together with restrictions of record." An-other deed in 1947 conveyed 1 lot "subject to restric-tions of record," and a third deed in 1948 conveyed 2 lots, "except restrictions of record."

On the lots here in question the original deed from the Simpsons to the Robars was silent as to restric-tions. This deed was subsequently re-recorded on May 29, 1951, with the following language inserted therein:

"Not subject to restrictions of record. Grantors hereby give consent to the grantees for the use of the above-described property for legitimate business purposes."

The conveyance of lots 100 and 101, which plaintiff Stark obtained from a third party, contained the provision, "subject to restrictions as recorded in Oakland county records." The conveyance of lot 99 reads: "Subject to the conditions and restrictions recited in deed, recorded in liber 1198 of deeds, on pages 180–181, Oakland county register of deeds office."

All 4 questions raised by appellants have to do with whether the lots in Union Lake Highland subdivision are subject to reciprocal negative easements.

The rule of reciprocal negative easements was enunciated in *Allen* v. *City of Detroit*, 167 Mich 464, 469 (36 LRA NS 890), the Court saying:

"The law is well settled that building restrictions of the character shown are in the nature of reciprocal negative easements, and may be created upon a division, and conveyance in severalty to different grantees, of an entire tract. That a portion of the conveyances do not contain the restrictions will not defeat the same. Although some of the lots may have written restrictions imposed upon them and others not, if the general plan has been maintained from its inception, if it has been understood, accepted, relied on, and acted upon by all in interest, it is binding and enforceable on all *inter se*. It goes with the land, and is equally binding on all purchasers with notice. * * * In *Tillotson* v. *Gregory*, 151 Mich 128, involving the enforcement of an alleged general plan of restriction in a district where some of the lots were subjected thereto in writing and others were claimed to be under the same restraint by parol, Justice McAlvay, though not finding the allegation sustained by the proofs, says (p. 133):

" 'That restrictions of the kind claimed by complainants may be created and held valid is not disputed. Citation of authorities upon that question is therefore not necessary.' "

The prevailing authorities were re-examined in *McQuade* v. *Wilcox,* 215 Mich 302 (16 ALR 997), with the conclusion that (p 311):

"Upon principle we think the rule adopted by Mr. Tiffany and the Maryland, Missouri and New York courts is the correct one. By the deeds executed by Mrs. Wilcox a negative easement was by her placed upon lot 2. When these deeds were placed on record this gave constructive notice of that negative easement. Defendant Shelbourne Company was not a bona fide purchaser and took subject to the rights of the plaintiffs."

See, also, annotation in 16 ALR 1013.

Perhaps the leading case on this subject in Michigan is *Sanborn* v. *McLean,* 233 Mich 227 (60 ALR 1212), where the prevailing rule is stated in these terms:

"Where a common owner had burdened all lots retained by him with reciprocal negative easements, such lots, when later sold to separate parties, remained burdened therewith, and right to demand observance thereof passed to each purchaser with notice of the easement." (Syllabus 4.)

"Where the abstract of title showed that defendants' lot, while in the hands of a common owner, was burdened with a reciprocal negative easement, they and their predecessors in title are bound by constructive notice thereof, under the recording acts, and, therefore, they may not disregard said restriction because it fails to appear in their chain of title." (Syllabus 5.)

See authorities annotated in 60 ALR 1216 and 1223.

A situation similar to the one in the instant case was presented in *Sullivan* v. *Playfair Realty Co.*, 238 Mich 274, where Oakman sold to Meyer lots on land contract containing restrictions as to their use. Meyer later surrendered or released his contract in exchange for other lots and Oakman proceeded to sell some of these same lots free of the residential restriction which had formerly been imposed thereon. In sustaining the enforceability of the original restriction, the Court said (p 280):

"No violations of those restrictions by the many purchasers who bought, built, and established their homes there are shown since the property was platted. No juggling of the platter by buying these lots back and selling them again without restrictions could lift the reciprocal easement impressed upon them, either as to himself or anyone else with notice. *Sanborn* v. *McLean*, 233 Mich 227 (60 ALR 1212)."

*Kiskadden* v. *Berman*, 244 Mich 473, is to the same effect. See, also, *Indian Village Association* v. *Barton*, 312 Mich 541; *Zelinski* v. *Becker*, 318 Mich 209; and authorities cited in 4 ALR2d 1364.

The appellants here contend that reciprocal negative easements cannot be created by a land contract purchaser who later surrenders his contract to the original contract vendor and cites *Kraushaar* v. *Bunny Run Realty Co.*, 298 Mich 233, as controlling. The distinction in the *Kraushaar Case* is readily apparent. There, the contract subdivider purchased land on contract. After sale of numerous lots there was a default on the original contract. Summary proceedings were instituted and judgment was entered for the original contract vendor. No writ of restitution was issued because the corporation vendee surrendered the premises. In the light of these facts the Court said (p 240):

"Obviously plaintiffs Kraushaar are not entitled

to any relief against the Bunny Run Realty Company or its agent on the ground that such plaintiffs hold certificates of membership in the Bunny Run Country Club, which certificates were issued to them by the Lake Homes Realty Company; nor in the instant suit can such plaintiffs obtain relief under the terms of their contracts of purchase of lots from the Lake Homes Realty Company. As above indicated, any title or rights obtained by these plaintiffs from the Lake Homes Realty Company, which was only a contract vendee of the Porritt farm, were subject to the superior title of the vendors of that property; and when that contract was terminated by summary proceedings all rights of these plaintiffs under these contracts vanished."

Appellants fail to recognize the distinction between a voluntary surrender and a forfeiture or foreclosure by judicial action.

A vendor who takes from his vendee a voluntary surrender of a contract takes it subject to all the obligations assumed by the latter to third parties and is, therefore, obligated to perform his vendee's contract. *Woodward* v. *Clark,* 15 Mich 104.

Appellants' contention is correct when a forefeiture or foreclosure is involved, but that is not the situation here, because Simpson, in effect, took an assignment of the contract by Dominique, which assignment was subject to the general plan of restrictions in the deeds to the lots which had been sold. Simpson testified in the instant case, and his testimony is undisputed. His subsequent conveyances of other lots after acceptance of the surrender by Dominique, "subject to restrictions of record," are clear evidence of his intent to fulfill his vendee's obligation and to carry out the general agreement of restrictions for the subdivision.

Appellants, in contending that even though a subdivision may be subject to reciprocal negative easements, argue that such restrictions cannot attach to

lots which are excluded from such restrictions, in the light of the following language in the Simpson-Dominique conveyance:

"No salesroom or place for the transaction of business shall be erected or maintained on any lot excepting such lots as shall by the owner of said subdivision be designated for the purpose, which designation shall be included in the contract and in the deed therefor."

This language does not limit or modify the clear and unambiguous language of the first paragraph of the land contract, which reads:

"All lots to be used for single-residence purposes only with the exception of lots 1 to 22, 33 to 38 inclusive, and lot 114."

Appellants' contention that reciprocal negative easements were not created here because they do not originate in a common owner or conform to a uniform plan is contrary to the evidence presented by the record before us. See *Eveleth* v. *Best,* 322 Mich 637.

Appellants seek to rely upon minor violations as a ground for a change of condition or circumstances. We need not cite any authority for the proposition that minor infractions of restrictions by other lot owners do not preclude this appellee from objecting to the major violation of a business structure on lots restricted for residential purposes.

Upon examination of the testimony and evidence *de novo,* we reach the same conclusion as did the trial judge: "That the record shows a general plan of restrictions binding on the fee owners and binding on the defendants."

The decree is affirmed, with costs to appellee.

Butzel, C. J., and Carr, Sharpe, Boyles, Reid, Dethmers, and Kelly, JJ., concurred.