### MORRIS *v.* LEVIN.

1. ALTERATION OF INSTRUMENTS — UNAUTHORIZED ALTERATION — MUTUAL CONSENT NECESSARY TO CHANGE.

A material change in the building restrictions on a city lot conveyed by land contract, made by an employee of the vendor after execution and delivery, was unauthorized, where there was no proof that the contracting parties ever met and mutually consented to such alteration, or that it was ever called to the vendee's attention or ratified by her.[1]

2. SAME — UNAUTHORIZED ALTERATION VOIDS INSTRUMENT — UNCHANGED DUPLICATE EVIDENCE OF AGREEMENT.

Any material unauthorized alteration in a written instrument works a destruction of it to such an extent that it becomes in legal effect a nullity, and no rights may be asserted or proved by it, but where the instrument is executed in duplicate, both being primary evidence, if one duplicate remains unaltered it furnishes competent

---

[1]Alteration of Instruments, § 5.

primary proof of the agreement, although the other
duplicate has been destroyed by mutilation.[2]

3. COVENANTS—BUILDING RESTRICTIONS—NOTICE—INJUNCTION.
  Where a subdivision was generally advertised and sold
    out as a high grade, restricted, residential district, and
    the restrictions had been generally complied with, the
    purchaser of a lot who had notice of the restrictions and
    their general observance was properly enjoined from vio-
    lating them, although, under his contract with the orig-
    inal vendee, use of the premises was "limited by the
    restrictions of record only, if any," and a few lots in
    the subdivision had been sold without restrictions.[3]

Appeal from Wayne; Mandell (Henry A.), J.  Sub-
mitted January 22, 1926.  (Docket No. 123.)  De-
cided December 8, 1926.

Bill by Keith M. Morris and others against Nathan
Levin and another to enjoin the violation of building
restrictions.  From a decree for plaintiffs, defend-
ant Levin appeals.  Affirmed.

*Colombo, Colombo & Colombo,* for plaintiffs.

*Friedman, Meyers & Keys,* for appellant.

STEERE, J.  This bill was filed to restrain defend-
ant Levin and his contractor, Polsky, from building
a 13-family apartment house on lot 193 of the Linwood
Heights subdivision in the northwest part of Detroit,
said subdivision being a part of sections 13 and 28,
10,000-acre tract, formerly in the township of Green-
field.  It is bounded on the north by Gray avenue, on
the east by Linwood avenue, and on the west by Dexter
boulevard, and has two avenues called Wildemere and
Lawton running through it north and south, and five
avenues running through it east and west, the most
southerly of which is Elmhurst.  It is subdivided into
813 lots, varying in width from approximately 20 to

[2]Alteration of Instruments, §§ 9, 86; [3]Deeds, 18 C. J. § 459
(Anno).

60 feet; 627 of them are 35 feet in width and front on the east and west avenues.    It was platted in May, 1916, by Messrs. Hugo A. Gilmartin, Frederick B. Gray, and Robert and Charles Oakman, who mutually agreed to sell the lots therein subject to determined restrictions.

When put upon the market it was advertised as a highly restricted residential subdivision.    The platters had a form of contract and of deed to correspond, containing the agreed restrictions, printed in quantities sufficient to cover the restricted lots in said subdivision.    When the property was platted they owned undivided interests in the same, holding as tenants in common, but later made a division of the lots and exchanged deeds with each other to accomplish that purpose.    Lot 193 on the south side of Elmhurst avenue was amongst those taken by Robert Oakman. He sold it on June 9, 1916, to Mrs. Sadie B. Bialy by a contract executed in duplicate on his regularly adopted and printed form with all its restrictions, the material portions of which are as follows:

"1. It is further covenanted and agreed, as a part of the consideration of this sale, that the said lot .........., excepting those lots fronting on Linwood avenue, shall be used solely for residence purposes. No single dwelling shall be erected on any of said lots, the cost of construction of which shall be less than three thousand five hundred ($3,500.00) dollars. No building shall be erected nearer than thirty (30) feet to the front line of said lot.    *    *    *

"3. No two-family flats or duplexes, so-called, the cost of construction of which shall be less than five thousand five hundred ($5,500.00) dollars, shall be erected on any of said lots; nor any four-family flat or apartment house the cost of construction of which shall be less than eight thousand ($8,000.00) dollars. No four-family flat or apartment house shall be erected on a site less than fifty-two and one-half (52½) feet in width.    The word 'site' herein contained, for the purpose of ascertaining the building lines hereinbe-

fore mentioned, shall be considered the same as the word 'lot.'   *   *   *

"5. Linwood Avenue:   All lots fronting on Linwood avenue are hereby expressly excepted from all of the foregoing restrictions."

The duplicate retained by Oakman remained unchanged; but it appears that a month or more after Oakman had executed and delivered to Mrs. Bialy her duplicate of the contract, a man named Stolberg employed in his office altered the restricting provisions in paragraph 1 of her duplicate to read "excepting these lots fronting on Linwood avenue, *and Elmhurst avenue and Dexter boulevard south of Monterey avenue* shall be used solely for residence purposes" (italicized words were interlined with a pen).   Mrs. Bialy lived in Bay City and left her contract with a Mrs. Pratt of Detroit to look after the payments on it for her.   Mrs. Pratt identified the contract and Mrs. Bialy's signature to it.   She testified positively that when delivered to Mrs. Bialy it did not contain the pen alterations which were inserted a month or six weeks later by some agent, that when the lot was bought she herself had nothing to do with any sales agents or Mr. Oakman's agents excepting making payments for Mrs. Bialy.   On cross-examination she reasserted the pen interlineation in the printed form of paragraph 1 was inserted by some agent about a month after the contract was delivered, and, asked if she knew by whom, said "Yes, it was Wynn and Lacey, who were the agents."   Stolberg testified, however, that he made the interlineation and had authority from Oakman to do so.

On August 1, 1924, Mrs. Bialy sold said lot 193 to defendant Levin.   She yet held it under her part-paid contract from Oakman and sold it to Levin under a contract containing the following cautiously worded contingent restriction:

"It is a condition of this agreement that the party

of the second part, his heirs and assigns, shall use the premises herein described, for purposes limited by the restrictions of record only, if any."

Lot 193 is 41.25 feet wide and is the last lot on the south side of the west end of Elmhurst avenue fronting upon it.   The lots west of it front on Dexter boulevard, which forms the westerly boundary of the subdivision.   Lot 192 adjoining 193 on the east had been purchased under the restrictions by plaintiff Belinsky, who testified he was induced to purchase in that locality by the advertised restrictions upon the subdivision, the lay and width of the street and the class of houses being erected in compliance with the restrictions, which were better and more costly than the minimum price imposed; that he had planned and intended to build on his lot a duplex house which would cost approximately $20,000, as others on that street had done and were doing.

Levin admitted that he tried unsuccessfully to buy Belinsky's lot.   After obtaining legal advice from a real estate salesman who operated in that vicinity, he bought lot 193, had plans prepared for a 13-family apartment on it, and started its construction.   The plan of his building extended it 10½ feet beyond the 30-foot front line restriction.   When property owners and residents on that street protested and pointed out the restrictions they claimed he was violating, he replied, amongst other things, that he would "take a chance.   *   *   *   if I will win in the court, then I will come up to the sidewalk.   It is up to you people now to stop me," and proceeded with his excavation. After written notice was served on and ignored by him, this bill was filed and a temporary injunction granted. It was made permanent when the case was heard, and defendant has appealed.

While the manner in which Linwood Heights subdivision was advertised, exploited, and sold as a high

class, highly restricted residential district has furnished a fruitful field for litigation over its actual or ostensible restrictions, as suits from that source which have reached this court and others shown yet in the trial courts indicate, the instant case is limited to the question of whether, under the facts disclosed by this record, lot 193 is under the two restrictions prohibiting erection of an apartment upon a lot less than 52½ feet wide and fixing a 30-foot building line limit.

As the property is platted, a row of lots at its extreme east and west sides front on Linwood avenue and Dexter boulevard with a north and south alley at the rear. All other lots in the entire subdivision front either north or south along the respective east and west avenues where they are located. The testimony indicates that in adopting the general plan for restricting the main body of this subdivision to a first-class residential district it was understood that lots facing on both Linwood and Dexter might be excluded from such restrictions.

Mr. Gray, one of the subdividers, testified he and Gilmartin owned half of this subdivision and when it was decided to plat it the owners expressly agreed that all lots except those fronting on Linwood and Dexter should be restricted to residential purposes. He and Gilmartin had forms printed for sale of lots expressly so providing, as did Oakman. They were substantially the same with the exception that in theirs lots facing on Dexter as well as Linwood were excepted from the general restriction. A form of their contract in evidence so showed. He also testified that all the lots which they had sold in the subdivision were sold subject to the restrictions in their printed form of contract, excepting on Linwood and Dexter. Asked "Do you know, as a matter of fact, that Mr. Oakman issued contracts for lots on the south side of Elm-

hurst avenue, excepting them from any restrictions whatsoever?" he replied, "Absolutely, no. I have never seen any."

Mr. Leroy Gilbert, a practicing attorney, who testified he looked after the legal end of Mr. Oakman's business and had served him in that capacity since 1910, stated that he prepared the forms of contract used by Oakman and had a sufficient number printed to cover all restricted lots in the subdivision; that in 1916 when this property was platted and put upon the market he was officed with Oakman and had charge of the entire business in his legal capacity, and that it was "sold out a number of years ago. * * * but there have been a number of resales since then." It was the policy, when making sales, to use the adopted forms of contracts and deeds which had been printed at the same time. No authority was given Stolberg to change the forms, to his knowledge, and if any such authority had been given during the time he was there he would have known it. Of the restrictions he testified, in part, as follows:

"*Q.* Now, Mr. Gilbert, you don't know, as a matter of fact, what Mr. Oakman intended as restrictive covenants at the time of selling these lots, do you?

"*A.* Yes, I do. This contract was made prior to selling of any lots in the subdivision.

"*Q.* You made the contract, you prepared the form prior to the sale of the lots?

"*A.* Yes. * * * I never heard that they abandoned the original plan that we mapped out in the first instance. I do know of cases where Mr. Stolberg, of his own initiative, has made changes in the contracts, after they were executed by Oakman.

"*Q.* Do you know of any particular instance?

"*A.* Yes, I have four cases pending here in the circuit court where he has inserted the words 'and paving' in the forms. I can give you the names of the cases. * * *

"*Q.* What was Stolberg's position in 1916 in Robert Oakman's office?

"*A.* He styled himself business manager, which was a little more comprehensive a term than actually suited him. He had charge of delivering contracts to the agents, and receiving them back from the agents, and taking care of that end of it. That is, to my knowledge, all that he ever did."

Stolberg identified the interlineation in the contract of Mrs. Bialy as in his handwriting, and testified he was authorized to make such alterations but gave no details of the circumstances, asserted contracts for lots on Elmhurst were supposed to contain the exception clause, and when shown Oakman's duplicate of his contract with Mrs. Bialy, said he could not account for the omission to interline it except at that time they "were handling thousands of contracts. If somebody came up, it was written in the other contract." He was not in Oakman's employ at the time of the trial, and, when asked if he had been arrested for embezzling funds from Oakman, objected to replying because that had nothing to do with the case, and the objection was sustained. His testimony is not in harmony with that of Gilbert, but, if credited, only carries the issue to Oakman's right to authorize him to tamper with this real estate contract a month after it had been executed and delivered to Oakman's grantee.

The trial court found that at the time this case was heard,

"every building in the subdivision, two hundred sixty-four (264) in number have been erected in strict compliance with the foregoing building restrictions and that there is not a single violation of the foregoing building restrictions in the entire subdivision except on Linwood avenue and Dexter boulevard."

Defendant Levin owned business property in that part of the city. The testimony is persuasive that he was of an inquiring mind and not ignorant of existing conditions and development of the subdivision as

236—Mich.—32.

a restricted district. When he purchased lot 193 many fine buildings costing from two to three times the minimum price fixed by the restrictions had been built along Elmhurst avenue and in that vicinity. An uncle of his owned a lot subject to the restrictions directly across Elmhurst from 193.

Austin, the real estate salesman who Levin said told him lot 193 was not restricted and sold it to him as agent for Mrs. Bialy, admitted that when he sold Levin the lot he so told him, but testified that after interviewing Oakman he advised Levin it should be used for residence purposes and he had better respect the 30-foot building line restriction. Of his interview with Oakman he testified in part:

"I asked Mr. Oakman how it happened that the pen and ink notations showed Elmhurst avenue was not restricted, on his particular part, and he told me that about the time it was platted, he said that the Michigan Railway at Bay City was planning to come into Detroit to compete with the D. U. R. and that they wanted an opening into Detroit, and they gave them this right of way. * * * Later on, he said that the Michigan Railway went bankrupt, and abandoned their plans for running a street car down Elmhurst, and that Mr. Oakman, prior—a few weeks prior to the time that the subdivision was put on, had not intended it for business purposes, but that later when he knew that the street car track was going down there, he thought he would except Elmhurst for business. So, then he said that some of the contracts had got out, without the pen and ink notations in them. So, that's all that he told me. And he said that he thought inasmuch as there was no street car going down there, that it would not be any good for business any more, that they should build residences."

Oakman is said to have been absent from the city and was not called as a witness, so we are not favored with his explanation as to these interlineations. It appears that in the division of lots between the owners,

Oakman took title to 38 of the 62 lots fronting Elmhurst on the south side of the street.

About 20 of his contracts for these lots had pen and ink notations inserted in the printed form of contract relieving them from the general building restrictions except as to cost and height applicable to Linwood and Dexter.

When it was learned that some contracts for lots on Elmhurst had exceptions written into them the owners of certain of such entered into and executed a written agreement for the purpose of mutually maintaining the restrictions.     In this they were assisted by Austin, who said that, desiring to get some activity in the sale of lots in that section, he thought the best thing to do was to remove the uncertainty.     This agreement was signed by the owners of lots 172 to 178 inclusive, and 181 to 186 inclusive, and was duly recorded in the office of the register of deeds.     Aside from Levin's all lots in that block are subject to the restrictions.     As before stated, no owner of lots on Elmhurst has violated the restrictions as found in the printed contracts, and at the time of the hearing there were buildings in strict compliance with the restrictions on 47 of the lots facing Elmhurst.

Though not featured in the briefs of counsel, it would seem that, on this record as made, the decree might well be affirmed on the ground of unauthorized material alteration in Mrs. Bialy's contract after its execution and delivery.     There is no proof that the contracting parties to it ever met and mutually consented to such alteration or even ever communicated directly or indirectly thereafter or that she ratified the alteration.     It is a general rule that when a right of action depends upon a written instrument, any material unauthorized alteration works a destruction of it to such an extent that no rights can be asserted under or proved by the mutilated instrument, and it becomes

in legal effect a nullity, but in that connection it has been held that where instruments are executed in duplicate, both being primary evidence, if one duplicate remains unaltered it furnishes competent primary proof of the agreement by the contracting parties although the other duplicate has been destroyed by mutilation. *Hayes* v. *Wagner*, 220 Ill. 256 (77 N. E. 211). Here Oakman's duplicate when produced in evidence was unaltered and contains the restrictions contended for by plaintiff.

It cannot successfully be contended that Levin was ignorant of the fact that he was seeking to purchase property in a restricted subdivision. It had been generally advertised and sold out as a high grade, restricted, residential district. When he sought to purchase there it was rapidly being built up and developed as such in compliance with the generally adopted plan of the platters. He knew his uncle had a restricted lot on Elmhurst directly across from 193. About the time he bought it he tried to buy lot 192 from Belinsky whose deed containing the restrictions had been recorded several months before. Instead of assigning her contract to him, Mrs. Bialy gave him a contract containing an equivocal provision concerning restrictions sufficient to put him on inquiry. After making such inquiry as he desired, he decided to "take a chance." As applied to the situation presented here, this court has so often considered the issues raised as to some lots being sold without restrictions where a general plan had been adopted by the platters and maintained from its inception in the use and development of the subdivision, that it is not necessary to go over the subject again. The following cases well sustain conclusions arrived at by the trial court. *Frink* v. *Hughes*, 133 Mich. 63; *Allen* v. *City of Detroit*, 167 Mich. 464 (36 L. R. A. [N. S.] 890); *Swan* v. *Mitshkun*, 207 Mich. 70; *Harley* v. *Zack*, 217 Mich.

549; *Farley* v. *Finn*, 226 Mich. 205; and cases cited in those decisions.

The decree will stand affirmed, with costs to plaintiffs.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.