INDIAN VILLAGE ASSOCIATION *v.* BARTON.

SAME *v.* BUHL.

1. Covenants—Residence Lots—Commercial Street at End of Subdivision—Waiver of Restrictions.

In suit to enjoin violation of claimed agreement creating building and use restrictions by purchasers of lots located within high-class residential portion of subdivision containing 179 lots, fact that 16 lots at one end facing one street were used for commercial purposes would not affect purely residential portion of the subdivision so as to constitute a waiver of the restrictions as to the entire tract.

2. Same—Completion of Alterations—Estoppel.

Fact that defendants who had purchased a residence in a subdivision restricted to single-family dwellings had completed alterations so as to convert it into a multiple dwelling during month before plaintiffs, neighbors and other lot owners in same subdivision, commenced suit did not estop plaintiffs where the alterations inside defendants' dwelling were not such as to challenge the attention of the neighbors.

Oral promises respecting the use of land, enforceable under the rules of estoppel or of part performance, see 5 Restatement, Property, chap. 44, topic B, pp. 3172–3178.

Acquiescence in breaches by another of promises respecting the use of land, see 5 Restatement, Property, § 561.

3. SAME—GENERAL PLAN—EVIDENCE—DIMINUTION IN VALUE.

Adoption of general plan agreement to restrict use of lots in subdivision to single residences was established by proof of character, appearance, and long-continued use of the property therein for more than 30 years without a single deviation and without diminution in values until adverse business conditions of the early 1930's.

4. SAME—GENERAL PLAN RESTRICTIONS—ENFORCEMENT.

Restrictions upon the use of property by reason of a general plan constitute a substantial property right which the owners can maintain and enforce.

5. SAME—BUILDING RESTRICTIONS—GENERAL PLAN—ENFORCEMENT—DEEDS.

Where the general plan of restricting a district to residential purposes has been generally observed, said restriction will be enforced, although the original plat and the deeds to some of the lots contained no restrictions.

6. SAME—INJUNCTION—RECORD—GENERAL PLAN—RECIPROCAL NEGATIVE EASEMENTS.

Where it appears that upwards of two thirds of the lots in subdivision containing 179 lots were expressly restricted of record, that with but a few exceptions the subdivider company did not convey title to a lot until the single dwelling was completed thereon, and that others had been sold under circumstances imposing reciprocal negative easements, plaintiff lot owners were entitled to injunctive relief against violation of general plan to restrict high-class residential subdivision to use for single-family residences only.

7. SAME—ABANDONMENT OF RESTRICTIONS—EVIDENCE.

Abandonment of restrictions to use of lots in high-class residential subdivision to single-family dwellings was not established where it appears a nonprofit corporation had been organized for purpose of enforcing the restriction, and only 7 rooming-house licenses under war emergency rooming-house ordinance had been taken out in area which included 118 homes.

8. SAME—GENERAL PLAN—RESTRICTIONS—PARTIES.

Where there was a plan or agreement common to all home owners relative to the use of premises for single-dwelling purposes only and defendants' grantors were parties thereto, defendants' property was subjected to such plan.

9. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PARTIES—IMPROVEMENT ASSOCIATIONS.

Cross appeal of a so-called improvement association of property owners, organized for the purpose of enforcing restrictions

upon the use of property within a subdivision and preservation of its value, from portion of decree dismissing it for lack of interest in subject matter of suits to enjoin violation of restrictions, is not passed upon where relief granted renders decision on such cross appeal unnecessary.

Appeal from Wayne; Miller (Guy A.), J. Submitted June 12, 1945. (Docket Nos. 72, 73, Calendar Nos. 43,082, 43,083.) Decided October 11, 1945.

Separate bills by Indian Village Association, a Michigan corporation, and others against John Lionel Barton and wife and Clara E. Buhl and Frank Hutto to enjoin violation of general plan creating building and use restrictions. From decrees entered, defendants Barton and Hutto appeal and plaintiff Indian Village Association cross-appeals. Cases consolidated. Affirmed.

*Lewis & Watkins,* for plaintiffs.

*Percy M. Lovett,* for defendants Barton.

*Oliver S. Smith,* for defendant Hutto.

BUSHNELL, J. Separate bills of complaint were filed by plaintiff Indian Village Association, a non-profit corporation, and certain owners of property located in Park subdivision of that part of the Cook farm, Private Claims 27 and 180, lying between Jefferson and St. Paul avenues in the city of Detroit, to restrain violations of a general plan and a claimed agreement creating building and use restrictions. Four such actions were tried together, resulting in decrees in favor of plaintiffs. The defendants in two of these cases, *i.e.,* John Lionel Barton and wife, and Frank Hutto, have appealed, it being stipulated that the appeals shall be consoli-

dated. Plaintiff Indian Village Association has cross-appealed from that portion of the decree which dismissed it from the suits, the trial judge being of the opinion that the association did not possess any interest in the subject matter of the litigation.

Plaintiffs' bills, as amended, were predicated upon the theory that a great majority of the lots was especially restricted of record, that the doctrine of negative reciprocal easements was applicable to most of the lots, and that as to the remainder, building and use restrictions were imposed pursuant to a general plan for the subdivision.

Plaintiffs made no attempt to obtain enforcement of restrictions as to 16 of the lots fronting on Jefferson avenue, and relief was sought only as to lots fronting on Seminole, Iroquois and Burns avenues, which portion was designated as "the restricted district." The individual plaintiffs owned and occupied homes in the subdivision, which were used as single-family dwellings, at 762, 779 and 1106 Seminole, 1453 Iroquois, and 982 Burns.

Defendants Barton and wife are the owners of a single dwelling house located at 776 Seminole, which stands on land next door to the dwelling house of plaintiffs Haigh and wife. It is claimed that Barton and wife, with notice and knowledge of the general scheme or plan of restriction, began alteration of this single home into a multiple dwelling, designed for the habitation of more than one family, in violation of the general plan and agreement which plaintiffs claim perpetually restricts the use of the property for the dwelling house of a single family only.

Defendant Hutto is charged with using the premises at 1116 Iroquois for rooming- and boarding-house purposes, in violation of the claimed restrictive agreement. Defendant Clara E. Buhl was

joined as a defendant in the Hutto case for the reason that she is the owner of record of the premises occupied by Hutto.

The subdivision in question, together with other lands adjacent thereto, generally known as the "Indian Village," extends from Jefferson avenue to the southerly boundary of Mack avenue. That which is concerned in this litigation prior to 1893 was owned by a number of tenants in common who united in the dedication of a plat in which no restrictive covenants are described. The lots in the subdivision are much larger both in frontage and depth and the streets are wider than those generally found in other portions of the city. When the Cook Farm Company, Ltd., which was organized by the tenants in common, began to sell lots on land contracts a number of these contracts contained restrictive covenants fixing front and side building lines and requiring the erection of single dwellings. In no instance was there any construction of any other nature; nor has any of the property, until recently, been used for any other purpose than single residences. So far as spaciousness and cost are concerned, the character of the subdivision is that of a high-class single-family residential neighborhood.

The trial judge found as a fact:

"That before the time of the partition of the lots in the subdivision and before the dedication of the plat therein, the tenants in common agreed among themselves, whether in writing or verbally is not apparent, that it was to be improved and sold as a highly-restricted subdivision, restricted to dwelling-house purposes only."

. He further stated:

"The evidence does not show any enforceable agreement as long as it was executory. It does show satisfactorily, to my mind, the existence of an

agreement, and this existence is demonstrated by the fact that the parties uniformly lived up to it.

"There is no question about the violation of a restriction to the use of these lots for single dwellings on the part of all of the defendants in these cases. The violation is conceded, if there is such a restriction. All of the contracts executed by the Cook Farm Company contain such restriction. Some of the contracts executed by each of the other allottees contain such restriction. The deeds do not contain it but by far the majority of them refer to contracts containing restrictions. The structures built in the subdivision, their nature and location, are persuasive evidence that they were built in accordance with common agreement."

The gist of the reasoning of the trial judge is expressed as follows:

"Assuming that this agreement was unenforceable while executory, the moment that the Cook Farm Company sold its first lot by contract containing a restriction it imposed upon itself, as the owner of all of the rest of the lots it owned, the obligation to hold all of them subject to the same restriction. It bound itself not to sell any other lots in its ownership except subject to the same restriction. Its act in making its sales under the contracts which are in evidence in the case and in binding itself as to all the rest of its properties to impose the like restrictions upon them amounted to its part performance of its agreement with the other allottees in the partition proceedings to create a restricted subdivision. It had put itself in a position where it was bound. This was part performance by it of its informal agreement with the other owners and placed it in the position where it could have enforced the agreement of the other allottees specifically under the section of the statute above quoted. (2 Comp. Laws 1929, § 13415 [Stat. Ann. § 26.910]). Such enforcement was never necessary. The other

allottees and their grantees scrupulously observed these terms of the restrictive covenants.   That scrupulous observance on their part takes the case beyond a case of part performance under that section and makes it a case of complete performance. The agreement on the part of the original owners in common of this subdivision was not only part performed; it was wholly performed; and this full performance created, taken together with the antecedent verbal agreement, enforceable restrictions."

Defendants' claim of estoppel is predicated in part upon lack of enforceability and waiver as to the Jefferson avenue frontage, and that such waiver extended to the entire subdivision.   As stated by the trial judge, that portion of Jefferson avenue which extends across the southerly boundary of the subdivision is commercial in character and there would have been good reason for never restricting this frontage.   However, notwithstanding its use, he held that that should not affect the purely residential portion of the subdivision.

Defendants Barton purchased their property in 1939, began improvements soon thereafter, and completed them in February of 1940.   The alterations inside the Barton dwelling were not such as to challenge the attention of the neighbors.   The bill of complaint in the Barton case was filed March 25, 1940, and in the Hutto case on February 1, 1940.

We agree with the trial judge that there is no basis for the claim of estoppel and waiver.

The controlling question is not as stated by appellants Barton and Hutto, i.e.:

"Was there a valid binding agreement entered into between the tenants in common, owners of the lands involved, prior to the year 1895, creating building and use restrictions?"

But, rather, as stated by plaintiffs and cross-appellants, *i.e.*:

"Did the owners of the premises later subdivided as Park Subdivision of that part of the Cook farm, P.C. 27 and 180, lying between Jefferson and St. Paul avenues, Detroit, Michigan, enter into a general scheme or plan for subdividing, partitioning and selling said premises restricted to use for single dwellings?"

Further, was such general scheme or plan carried out and performed, and were "most of the lots" subject to express restrictions of record restricting their use to single dwellings, and as to others, is the doctrine of reciprocal negative easements applicable?

The strongest proof in support of the general plan agreement is the character, appearance, and long-continued use of the property. There can be no question about the fact that for more than 30 years there was no deviation from the single residential dwelling plan and, not until the serious effect of adverse business conditions in the early 1930's was there any diminution in the property values in the subdivision. Notwithstanding defendant Barton's attempt to use for multiple dwelling purposes a single home costing probably $60,000 to $80,000 when it was built, and which he purchased for little less than $6,000, the remainder of the neighborhood is still a high-class single residential district. The use of large homes has been rendered somewhat difficult by war conditions, and yet plaintiffs and others continue to maintain their homes in the same manner as formerly.

Acute housing conditions in the city of Detroit resulted in the passage of an emergency ordinance, No. 171 D, as amended by No. 284 D, effective October 7, 1942, permitting the use of dwellings in

certain districts for temporary rooming-house purposes, provided no unauthorized physical changes are made in such dwellings, et cetera. The ordinance further provides that permission for such use shall "expire 30 days after the common council shall have determined by resolution that the need for temporary rooming-house facilities shall have terminated, or in the absence of any such determination, 6 months after the president of the United States shall have declared the period of unlimited national emergency ended."

The trial judge recognized the existing emergency when he answered the question, "What relief is to be granted?" by saying:

"This question addresses itself to the court of equity. As to those parties who have structurally changed the condition of their premises, there is not much that can be said in their favor. They have deliberately gone into a speculation which stands to give them very great profits. They must be held to have gone into it deliberately. At this time, therefore, injunctive relief may issue as against their use of their houses as so altered, with the exception that they may take licenses under the emergency ordinance of the city and in strict accordance with its terms and may use the premises in their present state in accordance with that ordinance. This is an emergency measure and is not intended to last longer than the war emergency lasts. Jurisdiction is retained for further action thereafter."

Restrictions upon the use of property by reason of a general plan have been approved by this court as "a substantial property right which the owners can maintain and enforce," in *Allen* v. *City of Detroit,* 167 Mich. 464 (36 L. R. A. [N. S.] 890); *French* v. *White Star Refining Co.,* 229 Mich. 474; *Signaigo* v. *Begun,* 234 Mich. 246; *Morris* v. *Levin,* 236 Mich. 490, and others. See, also, *Holderness* v.

*Central States Finance Corp.,* 241 Mich. 604, and *Nerrerter* v. *Little,* 258 Mich. 462. The following from the *French Case* is especially applicable to the instant case:

"The testimony persuades us that there was a general plan by the Beste heirs to restrict this neighborhood to residential purposes, and that this plan has been adhered to. In the early history of the subdivision, that vicinity was sparsely settled, and not as much attention was given to the restriction when sales were made. Later, as the locality began to develop and be improved, greater care was taken to add restrictions as sales were made by the Bestes. One of the best evidences that it was intended to be a restricted district is the fact that the restrictions have been observed and nothing but dwellings erected. The locality has been invaded by no business. A single exception, however, to this occurred when a tool house was erected on one of the lots, the neighbors purchased the owner's interest and it was discontinued. While some lots were restricted and others not, it appears to have been understood and regarded in the neighborhood as a restricted district, and its observance up to the present time will, under our holdings, entitle it to protection as such."

We are satisfied from our examination of the evidence *de novo* that there was a general plan restricting the property in question to use for single-dwelling house purposes only, and that these plaintiffs are not estopped from obtaining injunctive relief. Our conclusion is strengthened by testimony which shows that there were express single-dwelling restrictions in at least 24 deeds and 5 recorded land contracts covering about 34 of the 61 lots acquired in a partition proceeding by persons other than the original subdividers, Cook Farm Company, Ltd. As to the lots sold by the company, all of its contracts

contained provisions that the purchaser would build a single dwelling and would use it for the ordinary and usual purpose of a residence, and not otherwise. Further, with but a few exceptions, the company did not convey title until the single dwelling on the lot described in the deed was completed. More than 120 of the 179 lots in the subdivision were expressly restricted of record. As to other lots, some of the first recorded instruments contain restrictions which would impose reciprocal negative easements upon other lands then owned by the same grantor. See *McQuade* v. *Wilcox,* 215 Mich. 302 (16 A. L. R. 997), and *Sanborn* v. *McLean,* 233 Mich. 227 (60 A. L. R. 1212).

The existence of plaintiff Indian Village Association, a Michigan corporation, should be sufficient answer to the claim of abandonment or waiver. That corporation was organized February 24, 1938, and has been maintained for the purposes expressed in its articles of association as follows:

"To promote the development and improvement as a high-class residential district of the territory composed of the lots fronting on Seminole, Iroquois and Burns avenues between Jefferson and Mack avenues in the city of Detroit, county of Wayne, and State of Michigan and, to that end, to conduct litigation for the enforcement of building and use restrictions on property within such territory or any part thereof; to buy, sell, lease, rent, possess, own and manage real and personal property, but not for profit; and to do any other act or thing necessary or suitable to the general welfare and betterment of the said territory, the lots therein, or any of them, and the owners, lessees, purchasers or mortgagees of such lots, or any of them."

The record contains testimony that 6 of the 118 homes in the area were used for rooming-house operations prior to February 1, 1941, 3 of them on a

very small scale, and only 3 were in operation at the time of the hearing, and of these, 2 were defendants; 4 others have begun operations since, and 7 have taken out rooming-house licenses under the temporary emergency ordinance. This testimony cannot support claims of waiver and estoppel, and certainly, in the light of the emergency ordinance, does not spell out an abandonment of the restrictions by these plaintiffs.

The situation here presented can be distinguished from our recent holding in *Kathan* v. *Stevenson,* 307 Mich. 485. In that case plaintiff claimed a general plan restricting property in the Arden Park subdivision (also a high-class residential district) to use and occupancy by white persons only. As said in the *Kathan Case*:

"Evidently original purchasers of lots entertained the idea that the recorded building restrictions called for expenditures which would exceed the then financial means of colored persons. There was no plan or agreement common to all home owners in the subdivision relative to racial use and occupancy of premises. Defendants' grantors were never parties to any such plan and their property was not subjected to the desires of others on that subject."

The reverse is true in the instant case. There was a plan or agreement common to all home owners relative to the use of premises for single dwelling purposes only. Defendants' grantors were parties to such a plan and their property was "subjected to the desires of others on that subject."

In view of our conclusion, it is unnecessary to pass upon the cross-appeal of plaintiff Indian Village Association from that portion of the decree which dismissed it from the suits; otherwise the de-

cree in each case is affirmed, with costs to the remaining plaintiffs therein.

STARR, C. J., and NORTH, BUTZEL, SHARPE, BOYLES, and REID, JJ., concurred. The late Justice WIEST took no part in the decision of this case.