## SANBORN *v.* McLEAN.

1. COVENANTS—RESTRICTIONS—RECIPROCAL NEGATIVE EASEMENTS.

If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained may do nothing forbidden to the owner of the lot sold; they being subject to a reciprocal negative easement.[1]

2. SAME—RECIPROCAL NEGATIVE EASEMENT RUNS WITH LAND—NOT PERSONAL TO OWNER.

A reciprocal negative easement runs with the land sold, is not personal to owners, but is operative upon the use of the land by any owner having actual or constructive notice thereof, passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates.[2]

3. SAME—HOW RECIPROCAL NEGATIVE EASEMENTS ARISE.

Reciprocal negative easements are never retroactive, but arise, if at all, out of a benefit accorded land retained by restrictions imposed upon neighboring land sold by a common owner, and may not arise and fasten upon one lot by reason of other lot owners conforming to a general plan.[3]

4. SAME—RIGHT TO DEMAND OBSERVANCE OF RECIPROCAL NEGATIVE EASEMENT PASSES TO PURCHASER.

Where a common owner had burdened all lots retained by him with reciprocal negative easements, such lots, when later sold to separate parties, remained burdened therewith, and right to demand observance thereof passed to each purchaser with notice of the easement.[4]

5. VENDOR AND PURCHASER—CONSTRUCTIVE NOTICE OF RECIPROCAL NEGATIVE EASEMENT UNDER RECORDING ACTS.

Where the abstract of title showed that defendants' lot,

[1]Deeds, 18 C. J. § 459 (Anno); [2]Id., 18 C. J. § 458 (Anno); [3]Id., 18 C. J. § 458 (Anno); [4]Id., 18 C. J. § 459, 459 (Anno).

while in the hands of a common owner, was burdened with a reciprocal negative easement, they and their predecessors in title are bound by constructive notice thereof, under the recording acts, and, therefore, they may not disregard said restriction because it fails to appear in their chain of title.[5]

6. SAME—PURCHASER PUT TO INQUIRY BY CHARACTER OF NEIGHBORHOOD.

Where the purchaser of a lot in a residential district could not avoid noticing the strictly uniform residence character given the lots by the expensive dwellings thereon, clearly indicating a general plan, he was put to inquiry beyond merely asking his grantor whether there were restrictions, when he would have found of record the reason for such general conformation.[6]

Appeal from Wayne; Driscoll (George O.), J., presiding. Submitted October 22, 1925. (Docket No. 67.) Decided December 22, 1925. Rehearing denied April 6, 1926.

Bill by Jessie L. Sanborn and others against John A. McLean and others to enjoin the violation of building restrictions. From a decree for plaintiffs, defendants appeal. Modified and affirmed.

*Warren, Cady, Hill & Hamblen*, for plaintiffs.

*Clark, Emmons, Bryant & Klein*, for defendants.

WIEST, J. Defendant Christina McLean owns the west 35 feet of lot 86 of Green Lawn subdivision, at the northeast corner of Collingwood avenue and Second boulevard, in the city of Detroit, upon which there is a dwelling house, occupied by herself and her husband, defendant John A. McLean. The house fronts Collingwood avenue. At the rear of the lot is an alley. Mrs. McLean derived title from her husband and, in the course of the opinion, we will speak of both as defendants. Mr. and Mrs. McLean started

---

[5]Deeds, 18 C. J. § 462; [6]Id., 18 C. J. § 462 (Anno).

to erect a gasoline filling station at the rear end of their lot, and they and their contractor, William S. Weir, were enjoined by decree from doing so and bring the issues before us by appeal.    Mr. Weir will not be further mentioned in the opinion.

Collingwood avenue is a high-grade residence street between Woodward avenue and Hamilton boulevard, with single, double and apartment houses, and plaintiffs who are owners of land adjoining, and in the vicinity of defendants' land, and who trace title, as do defendants, to the proprietors of the subdivision, claim that the proposed gasoline station will be a nuisance *per se,* is in violation of the general plan fixed for use of all lots on the street for residence purposes only, as evidenced by restrictions upon 53 of the 91 lots fronting on Collingwood avenue, and that defendants' lot is subject to a reciprocal negative easement barring a use so detrimental to the enjoyment and value of its neighbors.    Defendants insist that no restrictions appear in their chain of title and they purchased without notice of any reciprocal negative easement, and deny that a gasoline station is a nuisance *per se.*    We find no occasion to pass upon the question of nuisance, as the case can be decided under the rule of reciprocal negative easement.

This subdivision was planned strictly for residence purposes, except lots fronting Woodward avenue and Hamilton boulevard.    The 91 lots on Collingwood avenue were platted in 1891, designed for and each one sold solely for residence purposes, and residences have been erected upon all of the lots.    Is defendants' lot subject to a reciprocal negative easement? If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the

owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners but operative upon use of the land by any owner having actual or constructive notice thereof. It is an easement passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates. It originates for mutual benefit and exists with vigor sufficient to work its ends. It must start with a common owner. Reciprocal negative easements are never retroactive; the very nature of their origin forbids. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner. Such a scheme of restrictions must start with a common owner; it cannot arise and fasten upon one lot by reason of other lot owners conforming to a general plan. If a reciprocal negative easement attached to defendants' lot it was fastened thereto while in the hands of the common owner of it and neighboring lots by way of sale of other lots with restrictions beneficial at that time to it. This leads to inquiry as to what lots, if any, were sold with restrictions by the common owner before the sale of defendants' lot. While the proofs cover another avenue we need consider sales only on Collingwood.

December 28, 1892, Robert J. and Joseph R. McLaughlin, who were then evidently owners of the lots on Collingwood avenue, deeded lots 37 to 41 and 58 to 62, inclusive, with the following restrictions:

"No residence shall be erected upon said premises, which shall cost less than $2,500 and nothing but residences shall be erected upon said premises. Said residences shall front on Helene (now Collingwood)

avenue and be placed no nearer than 20 feet from the front street line."

July 24, 1893, the McLaughlins conveyed lots 17 to 21 and 78 to 82, both inclusive, and lot 98 with the same restrictions.     Such restrictions were imposed for the benefit of the lands held by the grantors to carry out the scheme of a residential district, and a restrictive negative easement attached to the lots retained, and title to lot 86 was then in the McLaughlins. Defendants' title, through mesne conveyances, runs back to a deed by the McLaughlins dated September 7, 1893, without restrictions mentioned therein.     Subsequent deeds to other lots were executed by the McLaughlins, some with restrictions and some without.     Previous to September 7, 1893, a reciprocal negative easement had attached to lot 86 by acts of the owners, as before mentioned, and such easement is still attached and may now be enforced by plaintiffs, provided defendants, at the time of their purchase, had knowledge, actual or constructive, thereof. The plaintiffs run back with their title, as do defendants, to a common owner.     This common owner, as before stated, by restrictions upon lots sold, had burdened all the lots retained with reciprocal restrictions.     Defendants' lot and plaintiff Sanborn's lot, next thereto, were held by such common owner, burdened with a reciprocal negative easement and, when later sold to separate parties, remained burdened therewith and right to demand observance thereof passed to each purchaser with notice of the easement. The restrictions were upon defendants' lot while it was in the hands of the common owners, and abstract of title to defendants' lot showed the common owners and the record showed deeds of lots in the plat restricted to perfect and carry out the general plan and resulting in a reciprocal negative easement upon defendants' lot and all lots within its scope, and defend-

ants and their predecessors in title were bound by constructive notice under our recording acts. The original plan was repeatedly declared in subsequent sales of lots by restrictions in the deeds, and while some lots sold were not so restricted the purchasers thereof, in every instance, observed the general plan and purpose of the restrictions in building residences. For upward of 30 years the united efforts of all persons interested have carried out the common purpose of making and keeping all the lots strictly for residences, and defendants are the first to depart therefrom.

When Mr. McLean purchased on contract in 1910 or 1911, there was a partly built dwelling house on lot 86, which he completed and now occupies. He had an abstract of title which he examined and claims he was told by the grantor that the lot was unrestricted. Considering the character of use made of all the lots open to a view of Mr. McLean when he purchased, we think he was put thereby to inquiry, beyond asking his grantor whether there were restrictions. He had an abstract showing the subdivision and that lot 86 had 97 companions; he could not avoid noticing the strictly uniform residence character given the lots by the expensive dwellings thereon, and the least inquiry would have quickly developed the fact that lot 86 was subjected to a reciprocal negative easement, and he could finish his house and, like the others, enjoy the benefits of the easement. We do not say Mr. McLean should have asked his neighbors about restrictions, but we do say that with the notice he had from a view of the premises on the street, clearly indicating the residences were built and the lots occupied in strict accordance with a general plan, he was put to inquiry, and had he inquired he would have found of record the reason for such general conformation, and the benefits thereof

serving the owners of lot 86 and the obligations running with such service and available to adjacent lot owners to prevent a departure from the general plan by an owner of lot 86.

While no case appears to be on all fours with the one at bar the principles we have stated, and the conclusions announced, are supported by *Allen* v. *City of Detroit,* 167 Mich. 464 (36 L. R. A. [N. S.] 890); *McQuade* v. *Wilcox,* 215 Mich. 302 (16 A. L. R. 997); *French* v. *White Star Refining Co.,* 229 Mich. 474; *Silberman* v. *Uhrlaub,* 116 N. Y. App. Div. 869 (102 N. Y. Supp. 299); *Boyden* v. *Roberts,* 131 Wis. 659 (111 N. W. 701); *Howland* v. *Andrus,* 80 N. J. Eq. 276 (83 Atl. 982).

We notice the decree in the circuit directed that the work done on the building be torn down.    If the portion of the building constructed can be utilized for any purpose within the restrictions it need not be destroyed.

With this modification the decree in the circuit is affirmed, with costs to plaintiffs.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, STEERE, and FELLOWS, JJ., concurred.