DWYER v CITY OF ANN ARBOR

1. COVENANTS—REAL PROPERTY—EASEMENTS—RECIPROCAL NEGATIVE
   EASEMENTS—UNIFORM RESTRICTIONS—EXPRESS RESTRICTIONS—
   IMPLIED RESTRICTIONS.

   The doctrine of reciprocal negative easement is an equitable
   doctrine based upon the fairness inherent in placing uniform
   restrictions upon the use of all lots similarly situated, notwith-
   standing that less than all of the deeds contain an express
   restriction; thus, an implied restriction arises from the express
   restriction.

2. COVENANTS—REAL PROPERTY—LAND USE RESTRICTIONS—STRICT
   CONSTRUCTION—RESTRICTIONS NOT FAVORED.

   Generally, land use restrictions are not favored in the law and
   will neither be enlarged or extended by construction; land use
   restrictions are construed strictly against those seeking their
   enforcement and any doubts are resolved against restricting
   the use of real property.

3. COVENANTS—REAL PROPERTY—EASEMENTS—LAND USE RESTRIC-
   TIONS—GEOGRAPHIC EXTENT OF RESTRICTIONS—UNIFORM RE-
   STRICTIONS—RECIPROCAL NEGATIVE EASEMENTS.

   Rules of strict construction against the enforcement of land use
   restrictions should apply to the geographic extent of the opera-
   tive effect of such restrictions; where the plain language of
   recorded use restrictions makes the restrictions applicable to
   lots contained in a particular subdivision, all of the lot owners
   are subject to a uniform restraint on the use of their land;
   therefore, reciprocal negative easements are unnecessary to
   achieve uniformity of restriction and land usage.

4. COVENANTS—REAL PROPERTY—LAND USE RESTRICTIONS—RECIPRO-
   CAL NEGATIVE EASEMENTS—COMMON OWNERSHIP REQUIREMENT
   —SUBSEQUENTLY ACQUIRED PROPERTY—FUTURE USE OF LAND.

   A reciprocal negative easement requires common ownership at

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4] 20 Am Jur 2d, Covenants, Conditions, and Restrictions §§ 173,
   187.

[2] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 187.

[5–9] 61 Am Jur 2d, Pollution Control §§ 69–73, 76.

the time express restrictions are created and the scope of those restrictions should not be extended to include land subsequently acquired; absent such a rule, subdivision developers would be discouraged from protecting lot buyers by recordation of uniform subdivision use restrictions and thereby be bound by an *expression of future intention* as to the use of land subsequently acquired near the subdivision, even though that use may no longer be physically or economically feasible; the doctrine of reciprocal negative easement was not designed to have such an effect.

5. HEALTH AND ENVIRONMENT—POLLUTION—FEDERAL LIMITATIONS— ENVIRONMENTAL PROTECTION ACT—VIOLATIONS—PRIMA FACIE CASE—STATUTES.

Limitations are imposed by the Administrator of the Federal EPA upon the amount of certain constituent elements of waste treatment effluent and any pollutant discharged in the waste treatment effluent that exceeds those limitations is unlawful; the relationship between those Federally established limitations and the Michigan environmental protection act determines whether a violation constitutes a prima facie case under the Michigan Act (33 USC 1311, 1314, MCLA 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

6. HEALTH AND ENVIRONMENT—POLLUTION—FEDERAL REGULATIONS— EFFLUENT DISCHARGE PERMITS—FEDERAL-STATE CONFLICTS— FEDERAL PREEMPTION.

Adoption of *Federally approved pollution programs* allows the adopting state to issue discharge permits and these permits are the medium of enforcement between the state and an effluent discharge facility; the state program must comply with the Federal regulations establishing effluent limitations; states may establish their own limitations but none may be less stringent than the Federal limitations, and to the extent they conflict, they are preempted by the Federal regulations under the supremacy clause of the United States Constitution (US Const, art VI).

7. HEALTH AND ENVIRONMENT—POLLUTION—ENVIRONMENTAL PROTECTION ACT—EFFLUENT DISCHARGE PERMITS—POLLUTION LIMITATIONS—VIOLATION OF LIMITATIONS —PRIMA FACIE CASE.

Establishing violations of discharge permit conditions is sufficient to constitute a prima facie case that the facility has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein; once a permit is issued,

its conditions of effluent limitation set a point of demarcation above which a permit recipient may not lawfully emit pollutants from its treatment facility.

8. HEALTH AND ENVIRONMENT—POLLUTION—FEDERAL REGULATIONS—
   FEDERAL ENFORCEMENT OF REGULATIONS—STATE DISCHARGE
   PERMITS—ACTIONABLE VIOLATION OF REGULATIONS— ENVIRON-
   MENTAL QUALITY.

   Effluent pollution limitations on state discharge facilities are subject to Federal standards set pursuant to Federal legislation and enforced in Federal Courts; Federal research resources underlie the formulation of those limitations and the expertise of the state is used in fixing permit conditions, and where discharge permit violations constitute unlawful conduct such violations are actionable because the purpose and policy of both Federal and Michigan environmental legislation compels this result in developing a common law of environmental quality.

9. HEALTH AND ENVIRONMENT—POLLUTION—COMMUNITY EXPANSION
   —WASTE TREATMENT FACILITIES—HEALTH, SAFETY AND WEL-
   FARE.

   A city may not continue to permit increased community expansion without providing the necessary facilities to treat the concomitant waste by-products where such conduct would exacerbate the existing environmental pollution contrary to the interest of public health, safety, and welfare.

Appeal from Washtenaw, Robert V. Fink, J. Submitted August 31, 1977, at Detroit. (Docket Nos. 77-1086, 77-1352, 77-1353, 77-1354.) Decided October 11, 1977. Leave to appeal applied for.

Complaints by John Dwyer, for himself and others similarly situated, against the City of Ann Arbor, and others, seeking to enjoin the city from approving or issuing building permits for multiple-family housing on certain real property. Judgments for plaintiff. Defendants appeal by leave granted. The cases were consolidated on appeal. Reversed in part, and remanded.

*Warner, Hart, Morgan & Fuzak,* for plaintiff.

*R. Bruce Laidlaw,* Acting City Attorney, for defendant City of Ann Arbor.

*Conlin, Conlin & McKenney* (by *Allen J. Philbrick),* for defendants George V. Airey Building Company, George V. Airey and Aurora Airey.

*Bromberg, Robinson, Shapero & Cohn,* for defendant Hessee Realty, Inc.

Amici Curiae: *Fahrner & Steingold,* for Ecology Center of Ann Arbor. *Harris, Lax, Goldman & Gregg,* for Ann Arbor Chamber of Commerce.

Before: J. H. Gillis, P. J., and R. B. Burns and Bashara, JJ.

Bashara, J. Defendant, City of Ann Arbor, appeals an injunctive order of the trial court, prohibiting the city from issuing any building permits. That order was predicated upon the trial court's finding that the city's sewage treatment facility was polluting the environment, in violation of the Michigan Environmental Protection Act of 1970.[1] The remaining defendants appeal a contemporaneously issued order, restraining them from using certain real property for other than construction of single-family residences.[2] A finding that the property was subject to a reciprocal negative easement formed the basis of that order.

Defendant Airey[3] is a developer of residential real estate. He sequentially developed three resi-

---

[1] MCLA 691.1201, *et seq.;* MSA 14.528(201), *et seq.*

[2] Sometime prior to trial the city had rezoned the property for multi-family residential use upon the application of defendant Airey.

[3] For purposes of this opinion, it is unnecessary to differentiate the various organizational entites under which George V. Airey conducted his business.

dential subdivisions in Ann Arbor, containing single-family dwellings exclusively. As applies to this appeal, plaintiff represented a class consisting of residents of the first developed subdivision.

Coincident to recording the plat for the first subdivision, Airey recorded certain building and use restrictions.[4] The recordation of the restrictions occurred on June 26, 1963, prior to sale of any of the lots to the plaintiff class. In addition to the land used for the other two subdivisions, Airey subsequently acquired other real property which gave him substantially all of the land in a triangular area bounded by three thoroughfares. It is that property within the triangle, other than the land used for the subdivisions, upon which the plaintiff successfully sought to impose the easement.

---

[4] The restrictions state in pertinent part:

"Vernon Development Co., a Michigan Corporation, being presently the owner of all of the lots in Lansdowne, in the City of Ann Arbor, Washtenaw County, Michigan, according to the plat thereof as recorded in Liber 16 of Plats, pages 43, 44 and 45, Washtenaw County Records, and with the purpose of insuring uniformity of improvements on said lots, and the beauty and value of property in said subdivision does hereby establish the following building and use restrictions and easements, which shall be applied to the entire subdivision, and shall run with the land and shall be binding upon all successors in interest to the undersigned, for a period of twenty-five years from the date of recording of this instrument after which time said restrictions shall be automatically extended for successive periods of ten years unless an instrument signed by a majority of the then owners of the lots has been recorded, agreeing to change said restrictions in whole or in part.

"These restrictions are made for the benefit of both the present and of all future owners of lots in said subdivision, and enforcement of same may be by any of such owners by proceedings at law or in equity against any person violating or attempting to violate same. Invalidation of any one of these covenants by judgment or by Court order shall in no wise [sic] affect any of the other provisions which shall remain in full force and effect.

\* \* \*

"(a) No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one single family dwelling not to exceed two stories in height with attached garage no more than 30 feet in width for not more than two cars."

The trial court found that during the course of selling lots in the first subdivision, Airey and his agent represented that Airey owned, or controlled by option to purchase, all of the land within the triangle. Further, that all of the land would be developed exclusively as single-family residential. From this the trial court concluded that Airey was estopped to deny ownership of the land in question. The trial court then found that the "retained land" was benefited by the recorded use restrictions and was burdened with a reciprocal negative easement, restricting its use to single-family residential.

By creating a common ownership through the application of estoppel, an essential element was derived for imposition of the easement. However, neither the circumstances of this case nor the reasoning of the trial court justify application of the doctrine of reciprocal negative easement.

As the litigants recognize, the case of *Sanborn v McLean,* 233 Mich 227; 206 NW 496 (1925), establishes the criteria for ascertaining the applicability of the reciprocal negative easement doctrine. There is, however, a significant distinction between the factual background of *Sanborn* and its progeny and the case at bar. In the former, individual lots were sold by a common owner with only some of the deeds of conveyance containing use restrictions. To protect those who were expressly restricted in the use of their lots from uses by unrestricted lot owners that would adversely affect the character of the subdivision, the doctrine of reciprocal negative easement was developed. Its rationale, as an equitable doctrine, is based upon the fairness inherent in placing uniform restrictions upon the use of all lots similarly situated, notwithstanding that less than all of the deeds

contain an express restriction. Thus, the implied restriction arises from the express restriction. See, *e.g., Sanborn, supra,* and *Moore v Kimball,* 291 Mich 455, 460; 289 NW 213, 215 (1939).

In the case under review, all lots within the subdivision were subject to the use restrictions recorded incident to recordation of the subdivision plat. The plain language of the recorded use restrictions makes them applicable to the lots contained in that particular subdivision. To extend those restrictions to land acquired by Airey more than a year later would be clearly contrary to the general rule that restrictions, not being favored in the law, will neither be enlarged nor extended by construction. *Johnson v Fred L Kircher Co,* 327 Mich 377; 42 NW2d 117 (1950), *Putnam v Ernst,* 232 Mich 682; 206 NW 527 (1925).

Moreover, as a general rule, restrictions are construed strictly against those seeking their enforcement, and any doubts are resolved against restricting the use of real property. *Moore v Kimball,* 291 Mich at 461; 289 NW at 215. While *Moore, Putnam,* and *Johnson* addressed the substantive content of the restrictions, there is no significant reason why those rules should not also apply to the geographic extent of their operative effect. Here the restrictions by their terms covered lots within a particular subdivision. Nothing in the trial record supports the contention that at the time made, the restrictions were to encompass land outside that subdivision. All lot owners were subject to a uniform restraint on the use of their land; reciprocal negative easements were unnecessary to achieve that uniformity.

We are unable to discern any equity in extending the scope of those restrictions to include land not owned by Airey at the time the restrictions

were created. The retroactive effect given by the trial court to Airey's subsequent land acquisitions is at odds with the reciprocal negative easement requisite of common ownership at the time the express restrictions are created. See *Sanborn v McLean,* 233 Mich at 230; 206 NW at 497.

Were we to accept plaintiff's argument, subdivision developers would be discouraged from protecting lot buyers by recordation of uniform subdivision use restrictions. They would be placed in the tenuous position of being bound by an expression of future intention as to the use of land subsequently acquired near the subdivision, even though that use may no longer be physically or economically feasible. It is our opinion that the doctrine of reciprocal negative easement was not designed to have such an effect.[5] Accordingly, we vacate the trial court's order and dismiss the complaint against all defendants except the City of Ann Arbor.

The trial court found that the Ann Arbor sewage treatment facility discharges effluent, the character of which is violative of the conditions established in its discharge permit. This permit is issued by the state under authority derived from the Federal Water Pollution Control Act,[6] as amended. Since the trial court placed significant emphasis upon these permit violations in issuing the injunction, we must determine whether they established a prima facie case under the Michigan act.

Ann Arbor concedes that its treatment plant has operated in violation of the discharge permit and acknowledges that the plant's current capability

---

[5] While our research has not disclosed any Michigan cases with a similar factual array, we note that under facts closely aligned with the case at bar, the Supreme Court of Delaware reached the same result. *See Carey v Shellburne, Inc,* 224 A2d 400 (Del, 1966).

[6] 33 USC § 1151, *et seq.,* as amended.

renders compliance impossible given the community demands made upon the facility. Nevertheless, the city contends, there is no violation of the Michigan act because there is no substantial injury, or threat of substantial injury, to the environment or public health. The expert testimony at trial supported that argument.

Recognizing that its treatment plant was overburdened, Ann Arbor formed a special committee to formulate construction permit quotas. According to expert testimony, development pursuant to those quotas, although creating additional demands upon the treatment facility, would not result in a threat of substantial injury to the environment or public health. There was also testimony to the effect that previous efforts by Ann Arbor to gain state approval for expansion of the treatment facility were frustrated by the state's commitment to a "super sewer" program, which was later abandoned.

Subsequently, Ann Arbor obtained the needed approval, and at oral argument this Court was advised by the city that a Federal grant was approved for the expansion program scheduled to commence before the end of this year. However, until the benefits of that program come to fruition, Ann Arbor will continue to violate the conditions of its discharge permit.[7]

Our review of the trial court's order must recognize the position of preeminence given to the resolution of environmental degradation problems. But our decision must also be tempered with pragmatism and a realization that the solution to such

[7] Although completion of the expansion program will take three years, the city noted in its appellate brief that interim benefits will be realized that will enable it to better the existing facility's performance, reducing the amount of pollutant discharged.

a complex array of problems is neither simple nor attainable within a short time span.

Limitations are imposed upon the amount of certain constituent elements of waste treatment effluent by the administrator of the Federal Environmental Protection Agency. 33 USC §§ 1311 and 1314. Any pollutant discharged in the waste treatment effluent that exceeds those limitations is expressly made unlawful. 33 USC § 1311(a). The relationship between those Federally established limitations and the Michigan act is determinitive of the outcome of this case; *i.e.,* does a violation of the limitations constitute a prima facie case under the Michigan act?

Enforcement of the Federally established effluent limitations is effected through the National Pollutant Discharge Elimination System. 33 USC § 1342. The medium of enforcement is the discharge permit, such as that issued to Ann Arbor. Where Federally approved programs are adopted, the adopting state may issue the discharge permit. 33 USC § 1342(a). However, the state program must comply with the Federal regulations establishing effluent limitations. *American Frozen Food Institute v Train,* 176 US App DC 105; 539 F2d 107 (1976). Although states may establish their own limitations, none may be less stringent than the Federal limitations. 33 USC § 1370. To the extent they so conflict, they are preempted by the Federal regulations under the supremacy clause of the United States Constitution. US Const, Art VI, *American Iron & Steel Institute v EPA,* 526 F2d 1027 (CA 3, 1975).

Ann Arbor contends that showing only a violation of the permit is insufficient to establish a prima facie case under the Michigan act. It is argued that the evidence must also establish some

injury, or threat of injury, to the environment. This position is based upon Ann Arbor's interpretation of the meaning of the permit limitations. The city argues that the limitations are merely what the issuer believes to be practically attainable given the type of facility utilized, and that they bear no relation to the quality of the receiving environment or the effect on it resulting from exceeding a limitation.

We cannot agree with Ann Arbor's view of the permit limitations, given the context of the enabling legislation. Rather, it is our conclusion that establishing violations of discharge permit conditions is sufficient to constitute a prima facie case that the defendant's conduct "has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein * * * ".[8]

Once a permit is issued, its conditions of effluent limitation set a point of demarcation above which a permit recepient may not lawfully emit pollutants from its treatment facility. 33 USC § 1311(a). The United States Supreme Court stated with regard to effluent limitations:

"Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform.

"Second, the Amendments establish the National Pollutant Discharge Elimination System (NPYDES) as a

---

[8] MCLA 691.1203; MSA 14.528(203).

means of achieving and enforcing the effluent limitations. Under NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms. *An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations* (including a timetable for compliance) of the individual discharger * * * ." *EPA v State Water Resources Control Board,* 426 US 200, 204–205; 96 S Ct 2022, 2024–2025; 48 L Ed 2d 578, 583–584 (1976) (Emphasis added, footnotes omitted.) See also *E I duPont de Nemours & Co v Train,* 430 US 112; 97 S Ct 965; 51 L Ed 2d 204 (1977), and *LaPierre, Technology-Forcing & Federal Environmental Protection Statutes,* 62 Iowa L Rev 771, 807–818 (1977).

Of course, effluent limitations are Federal standards set pursuant to Federal legislation and enforced in the Federal courts. However, the research resources of the Federal Environment Protection Agency underlie the formulation of those limitations. Moreover, in fixing the permit conditions pursuant to the effluent limitations, the expertise of our Department of Natural Resources is also employed. Neither the limitations nor the permit conditions are challenged by Ann Arbor.[9] We must conclude, in light of these circumstances, that discharge permit violations constitute unlawful conduct within the proscription of the Michigan act. The purpose and policy of both Federal and Michigan environment legislation compels this result in "developing a common law of environmental quality". See *Ray v Mason County Drain Commissioner,* 393 Mich 294, 306; 224 NW2d 883, 888 (1975).

It is also our conclusion that the trial court was

---

[9] It should also be noted that any challenge to the Federal limitations must be litigaged in the United States Court of Appeals. 33 USC § 1369(b)(1), *E I duPont de Nemours & Co v Train,* 430 US 112, 136–137; 97 S Ct 965, 979; 51 L Ed 2d 204, 222 (1977).

correct in finding that Ann Arbor did not establish an affirmative defense under MCLA 691.1203; MSA 14.528(203). To prove the affirmative defense, it must be shown "that there is no feasible and prudent alternative to the defendant's conduct *and* that such conduct is consistent with the promotion of public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction".[10] The defendant's evidence must demonstrate *both* elements of the defense.

We concur with the trial court's recognition that it is untenable to order the Ann Arbor treatment facility to cease operation. No one could reasonably contend to the contrary. There is no feasible and prudent alternative to sewage treatment, and terminating the existing plant's operation would undoubtedly have devastating effects upon the health of the Ann Arbor community. However, this is not to say that the city may continue to permit increased community expansion without providing the necessary facilities to treat the concomitant waste by-products. To permit such conduct would exacerbate the existing environmental pollution, contrary to the interest of public health, safety, and welfare.

While the trial court's order sought to eliminate any increase in environmental degradation, a laudable objective indeed, we must conclude that as a remedy, it was ill-conceived under the prevailing circumstances. Our conclusion is in nowise a disparagement of the trial court's analysis. Rather, it is based upon the alternative remedial measures presented to this Court in the amicus curiae brief of the Ecology Center of Ann Arbor and the fact that Federal funding has been obtained for expan-

---

[10] MCLA 691.1203; MSA 14.528(203). (Emphasis added.)

sion of the Ann Arbor treatment facility. None of these factors were present when the trial court formulated its order. Although Ann Arbor takes issue with some of the alternatives presented in the amicus brief, the evidentiary record is inadequate to support a final determination.

We therefore remand this aspect of the case for further proceedings consistent with this opinion. The trial court shall hold a further hearing within 40 days from the release date of this opinion and issue a substitute order, if any be required, 20 days thereafter. The present order of the trial court is vacated.

Reversed in part and remanded for proceedings consistent with this opinion. The complaint against all defendants, except the City of Ann Arbor, is dismissed. Costs to all defendants except the City of Ann Arbor, a public question being involved.