2011 WY 25

Terry CASH; Richard J. Maturi; Craig McCune and Rhonda McCune; and Rich Nelson and Rebecca Hilliker, Appellants (Plaintiffs),

v.

GRANITE SPRINGS RETREAT ASSOCI-ATION, INC., a Wyoming Nonprofit Corporation; Lynn Williams–Haas; Ted and Emma Esquibel; J.T. and Aimee Walsh; John and Sylvia Passehl; Marty and Gail Gill; Cheryl and Doug Brown; Jacque Cash; Mary Maturi; Craig Folsom and April Walton; Mike Trenam; Ben Hilsen and Susan Jennelly; Michael Duskin; Tim and Lynn Babbitt; Michael Emerson; Scott Smith and Deb Baumer; Richard W. Magill, Jr. and Tracy Farrell; Ted and Jan Lydigsen; CJ and David Di Pietra; Joe and Cindy Marek; Darrell and Dorothy Ban; Don and Barbara Sullivan; Rob and Nicole Farnham; Gary and Jo Ellen Mass; Dave Bilski; Bob Lick and Joanne Steane; Pete and Nancy Fillion; Dave and Melissa Brumbaugh; John and Lesley Zimmerman; Jerry and Kristen Peterson; Mike and Chris Caltagirone, Appellees (Defendants).

No. S–10–0117.

Supreme Court of Wyoming.

Feb. 17, 2011.

Representing Appellants: Daniel B. Frank of Frank Law Office, P.C., Cheyenne, Wyoming.

Representing Appellees Granite Springs Retreat Association, Inc.; John and Sylvia Passehl; Marty and Gail Gill; Cheryl and Doug Brown; Craig Folsom and April Walton; Mike Trenam; Ben Hilsen and Susan Jennelly; Michael Duskin; Tim and Lynn Babbitt; Michael Emerson; Scott Smith and Deb Baumer; Richard W. Magill, Jr. and Tracy Farrell; Ted and Jan Lydigsen; CJ and David Di Pietra; Joe and Cindy Marek; Bob Lick and Joanne Steane; Darrell and Dorothy Ban; Don and Barbara Sullivan; Rob and Nicole Farnham; Gary and Jo Ellen Mass; Dave Bilski; Pete and Nancy Fillion; Dave and Melissa Brumbaugh; John and Lesley Zimmerman; Jerry and Kristen Peterson; and Mike and Chris Caltagirone: Kate M. Fox and Amanda K. Ferguson of Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Ms. Fox.

Representing Appellees J.T. and Aimee Walsh: William L. Hiser of Brown & Hiser, LLC, Laramie, Wyoming.

Representing Appellees Lynn Williams–Haas, Ted and Emma Esquibel, Jacque Cash, and Mary Maturi: Pro se. No appearance.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶1] The district court ruled subdivision covenants recorded before the developer acquired legal title to the property were enforceable as equitable servitudes. Plaintiffs Terry Cash, Richard J. Maturi, Craig and Rhonda McCune, Rich Nelson and Rebecca Hilliker (referred to collectively as "Cash") own property in the subdivision and claim the district court erred in reaching that decision.

[¶2] We affirm.

## ISSUES

[¶3] Cash states the issues on appeal as follows:

*Issue No. 1*

Did the district court err when it held that Subdivider held an equitable interest in land through an alleged oral agreement such that when he recorded a Declaration of Protective Covenants (DPC) on a subdivision he owned at the time, the DPC was also effective and encumbered the land that was the subject of the alleged oral agreement to which Subdivider had no legal title and had not been platted as a subdivision?

*Issue No. 2*

Did the DPC which the Subdivider recorded apply to the lands of Granite Springs Retreat, Second Filing when the land was not platted as a subdivision at the time the DPC was recorded and there is no indication in any document that the DPC encumbered these unplatted lands before or after platting?

*Issue No. 3*

Did the Plaintiffs have notice that the DPC encumbered their land at the time of purchasing their respective tracts?

*Issue No. 4*

Are the Plaintiffs estopped by laches from raising their claims when although they had notice of an Amended DPC which was later invalidated by the district court in a separate action, their previous compliance

with a covenant scheme was based on the invalidated Amended DPC and the homeowners association itself took the position for a substantial period of time that the DPC was not applicable to the Granite Springs Retreat, Second Filing?

The defendants, including Granite Springs Retreat Association, Inc. (GSRA) and many individual lot owners (referred to collectively as "GSRA"), phrase the issue more generally:

> Did the district court correctly conclude that the Granite Springs Retreat Declaration of Protective Covenants are enforceable against all Granite Springs Retreat lots as equitable servitudes under *Streets v. J.M. Land Developing Co.*?

## FACTS

[¶ 4] The underlying facts of this case are undisputed. Lorenz Ranch, Inc. owned property off Happy Jack Road, near Curt Gowdy State Park in Laramie County. In the early 1970s, Abraham Lorenz and Deward H. Miller entered into a "handshake" agreement for Mr. Miller to purchase the property with the intention of subdividing it. Because of financing issues, the property was conveyed in two parcels at different times. The first parcel, the property south of Happy Jack Road, was conveyed by warranty deed on August 14, 1972. That property became Granite Springs Retreat, First Filing, and included lots one through eight. The rest of the property, which was north of Happy Jack Road and became Granite Springs Retreat, Second Filing, was conveyed to Mr. Miller in March 1977.

[¶ 5] After purchasing the first parcel, Mr. Miller filed a request with Laramie County for a preliminary plat of the Granite Springs Subdivision. Mr. Miller subsequently recorded a preliminary plat dated August 1, 1975, which included the land in both filings. An application for subdivision of land was filed with Laramie County on August 4, 1975, and indicated the subdivision would be known as the Granite Springs Retreat and would include sixty lots. The project scope

was also confirmed in an environmental impact report commissioned by Mr. Miller. That report specifically referred to covenants that "would be attached to all tracts to regulate the usage and development of the land."

[¶ 6] On October 1, 1976, Mr. Miller filed a plat for Granite Springs Retreat, First Filing. A few days later, on October 4, 1976, Mr. Miller filed a Declaration of Protective Covenants for the Granite Spring Retreat at Happy Jack Road and Curt Gowdy State Park. The declaration did not include a legal description, but referred to the affected property as the Granite Springs Retreat. Mr. Miller obtained legal title to the property included in the second filing approximately five months after he filed the declaration of covenants. He filed the plat for the Granite Springs Retreat, Second Filing, on August 11, 1977.

[¶ 7] In a deed recorded September 15, 1977, Mr. Miller conveyed the tracts within the Granite Springs Retreat, both filings, to Happy Jack Stable & Lounge, Inc., a corporation he and Mr. Lorenz formed.[1] On February 23, 1978, Mr. Miller filed an Amended Declaration of Protective Covenants. The amended covenants were identical to the original covenants except that they specifically allowed tracts four and five to be used for commercial purposes. Mr. Miller signed the amended covenants on behalf of the Granite Springs Retreat, but did not, in any way, acknowledge that the Happy Jack Stable & Lounge, Inc. held legal title to the property.

[¶ 8] On July 29, 1983, Mr. Miller filed an Affidavit of Intention which was recorded against all of the Granite Springs Retreat properties in both filings and stated that he intended the covenants to apply to both filings. Also in 1983, Mr. Miller convened a meeting of the owners of the lots to form a homeowner's association, as contemplated by the covenants. The lot owners agreed to form the Granite Springs Retreat Association (GSRA), for the purposes of administering the common areas and working with the Architectural Control Committee (ACC). The

---

1. Tract 39 had been previously conveyed by Mr. Miller to Rawhide Construction. There followed a number of conveyances of the tract in an apparent effort to clear up the title. None of the plaintiffs claim ownership of Tract 39, so we will not delve any further into its chain of title.

GSRA thereafter filed articles of incorporation with the Wyoming Secretary of State and adopted bylaws.

[¶ 9] In 1999, the district court declared the amended covenants invalid in *Millheiser v. Wallace*, Dist. Ct. No. 148–238, because they were signed by Mr. Miller after he had already conveyed the property to Happy Jack Stable & Lounge, Inc. That aspect of the ruling was not appealed, although other issues were considered by this Court in *Millheiser v. Wallace*, 2001 WY 40, 21 P.3d 752 (Wyo.2001). Another district court action entitled *Happy Jack Stable & Lounge, Inc. v. Granite Springs Retreat Association, Inc.*, Dist. Ct. No. 156–559, 2001 WL 36282211, also addressed the amended covenants.

[¶ 10] In *Granite Springs Retreat Association, Inc., v. Manning*, 2006 WY 60, 133 P.3d 1005 (Wyo.2006), the GSRA brought an action against the Mannings in small claims court, seeking recovery of past due association fees. The Mannings defended by arguing the covenants did not encumber their lot in the second filing. The circuit court ruled that the second filing lots were bound by the covenants as equitable servitudes. On appeal, the district court reversed, holding the circuit court did not have subject matter jurisdiction to determine the validity of restrictive covenants. *Id.*, ¶ 3, 133 P.3d at 1009. We affirmed the district court decision. *Id.*, ¶ 13, 133 P.3d at 1012. On remand, the district court conducted a trial *de novo* and, like the circuit court, concluded that the covenants were enforceable against the Mannings' property under the doctrine of equitable servitude.

[¶ 11] In February 2009, Cash commenced the present action against the GSRA and other lot owners. Mr. Cash, Mr. Maturi and Mr. and Mrs. McCune own property in Granite Springs Estate, Second Filing. Mr. Nelson and Ms. Hilliker own property in the first filing area. In essence, Cash sought a ruling that the covenants did not encumber Granite Springs Estates, Second Filing lots. Both sides moved for summary judgment and the district court granted summary judgment in favor of the GSRA and against Cash. It ruled that, although Mr. Miller did not have legal title to the second filing property

when he recorded the original covenants, he did have an equitable interest and the covenants were enforceable as equitable servitudes against the plaintiffs because they had notice of the restrictions when they purchased their properties. Cash appealed.

## STANDARD OF REVIEW

[¶ 12] Summary judgments are governed by W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We review a summary judgment *de novo*, using the same materials and following the same standards as the district court. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Hasvold v. Park County School Dist. No. 6*, 2002 WY 65, ¶ 11, 45 P.3d 635, 637–38 (Wyo.2002), quoting *Four Nines Gold, Inc. v. 71 Constr., Inc.*, 809 P.2d 236, 238 (Wyo.1991). *See also, Alpine Lumber Co. v. Capital West Nat'l Bank*, 2010 WY 62, ¶ 5, 231 P.3d 869, 870–71 (Wyo.2010).

## DISCUSSION

[¶ 13] Mr. Miller recorded the Declaration of Protective Covenants on October 4, 1976, but he did not receive the deed to the second filing property until March 23, 1977. It is, therefore, undisputed that Mr. Miller did not have legal title to the second filing property when he recorded the covenants. Thus, Mr. Miller could not impose restrictive covenants that would run with the land. *Streets v. JM Land & Developing Co.*, 898 P.2d 377, 379 (Wyo.1995), citing 20 Am. Jur.2d *Covenants, Conditions, and Restrictions* ¶ 33, 604 (1965). Nevertheless, the district court ruled that the second filing landowners were bound by the restrictions contained in the covenants because they were enforceable as equitable servitudes.

[¶ 14] The district court relied on our decision in *Streets* in reaching that conclusion. In that case, the developer entered into a contract for deed to purchase property it intended to subdivide. Prior to fully performing the contract and obtaining legal title to the property, the developer recorded restrictive covenants. When the developer brought suit against Streets asserting violation of several provisions of the covenants, she claimed the covenants were not enforceable because the developer did not have legal title to the property when it recorded the covenants. *Id.* at 378–79. We held that, although the developer did not have legal title to the property when it filed the covenants and could not, therefore, impose covenants that run with the land, the restrictions were enforceable as equitable servitudes against purchasers with notice. *Id.* at 380–81.

[¶ 15] We explained the legal principles of equitable servitudes as follows:

The general view is that a restrictive covenant is not strictly an easement and does not run with the land in the true sense of that term. **Such agreements are, however, enforceable in equity against all those who take the estate with notice of them, although they may not be, strictly speaking, real covenants so as to run with the land or of a nature to create a technical qualification of the title conveyed by the deed. The question is not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased.** It has been noted that the enforcement of restrictive covenants or equitable servitudes is based on the equitable principle of notice; that is, a person taking title to land with notice of a restriction upon it will not, in equity and good conscience, be permitted to violate such restriction.

. . . .

Accordingly, whether such a covenant runs with the land is material only in equity on the question of notice; if the

covenant runs with the land, it binds the owner whether or not he had knowledge of it, **whereas if it does not run with the land, the owner is bound only if he has taken the land with notice of it.** Thus, since ordinarily such a covenant does not run with the land and since it is not a true easement, it is enforceable against a purchaser or assignee of the property only if he takes with notice. One who purchases for value and without notice takes the land free from the restrictive covenant. (Footnotes omitted, emphasis added.)

20 AM.JUR.2D *Covenants, Conditions, and Restrictions* § 304, 868 (1965).

*Id.* at 379 (emphasis in original). *See also, Bowers Welding and Hotshot, Inc. v. Bromley,* 699 P.2d 299, 303 (Wyo.1985) (stating that a purchaser who had notice of an agreement containing restrictions is bound by those restrictions even if they are not of record).

[3] [¶ 16] The *Streets* decision concluded:

[A] contract theory of restrictive covenants, enforceable through the courts, makes sense in contemplation of modern land use. It is not unusual for land, even substantial tracts, to be purchased by a contract for deed with the intent of creating a subdivision. Even though the purchaser under the contract for deed is an owner of an equitable interest, that owner should not be foreclosed from structuring restrictive covenants for the subdivision. Such a limitation would not comport with logic or valid public policy in the late Twentieth Century. The only prerequisite to enforcement should be the notice to the subsequent owner of the restrictions coupled with the requisite intent on the part of the seller that those covenants would be binding upon subsequent purchasers with notice. *See Bowers Welding.*

*Streets,* 898 P.2d at 380. *Streets* identified three elements required for enforcement of subdivision covenants as equitable servitudes: 1) The developer had an equitable interest in the property when he imposed the covenants; 2) the developer intended that the covenants be binding upon subsequent

purchasers; and 3) the purchaser had notice of the covenants at the time he purchased property within the subdivision. *Id.* at 380. *See also, Bowers Welding,* 699 P.2d at 303.

[¶ 17] Applying those elements in the present case, the district court concluded that Mr. Miller held equitable title to the second filing lands by virtue of the "handshake" agreement with Lorenz Ranch. The general definition of "equitable title" is "the right to receive legal title upon performance of an obligation." *Merriam–Webster's Dictionary of Law* (1996).

[¶ 18] On appeal, Cash argues that Mr. Miller did not have equitable title because there was only an oral "handshake" agreement for the purchase and, as such, the agreement was void under the statute of frauds. The relevant provision of the statute of frauds provides that an agreement for the sale of real estate is void unless it is in writing. Wyo. Stat. Ann. § 1–23–105(a)(v) (LexisNexis 2009). *See also, Simek v. Tate,* 2010 WY 65, ¶ 19, 231 P.3d 891, 898 (Wyo. 2010). The district court held that Mr. Miller had an equitable interest in the property when he imposed the restrictive covenants because the "handshake" agreement was enforceable against Lorenz Ranch under the doctrine of partial performance. The doctrine of partial performance provides: "an oral agreement for the sale of land that has been partially or wholly performed by one party, to its detriment, may be enforced by that party." *Id.,* ¶ 21, 231 P.3d at 899. The partial performance exception is grounded in equity to prevent a fraud from being perpetrated when a party refuses to perform an oral agreement after the other party has already performed. *Id.,* ¶ 22, 231 P.3d at 899–900.

[¶ 19] The evidence in this case unequivocally establishes that Lorenz Ranch and Mr. Miller had entered into an agreement to convey the Granite Springs Retreat property. Herb Lorenz provided an affidavit in which he stated, "I have personal knowledge of the fact that my father, Abraham Lorenz, on behalf of the Lorenz Ranch Corporation, agreed prior to August, 1972 to convey to Deward H. Miller the entirety of the land upon which the Granite Springs

Retreat subdivision is currently located." Cash argues that, because the exact terms of the agreement, such as the purchase price, closing date, payment requirements, etc., are not known, the doctrine of partial performance could not save the agreement from application of the statute of frauds. While the exact terms of an agreement are required in a typical case involving the statute of frauds so that the court can require specific performance of said agreement, *see, e.g., Simek,* ¶ 21, 231 P.3d at 899, that is not our concern in this case. Our focus here is on determining whether the record shows the oral agreement had been performed such that a court would have recognized Mr. Miller's equitable right to enforce the agreement.

[¶ 20] The record is clear that Lorenz Ranch's and Mr. Miller's agreement pertained to the entire Granite Springs Retreat. At the time Mr. Miller filed the original declaration of restrictive covenants, both parties had partially performed that agreement by completing the transaction involving the first filing property. Because Mr. Miller had partially performed the agreement when he recorded the protective covenants, he had equitable title, i.e., "the right to receive legal title upon performance of an obligation," to the second filing property. *Merriam–Webster's Dictionary of Law* (1996).

[¶ 21] As is clear from the preceding discussion, the application of the statute of frauds and the partial performance exception to the facts of this case creates an anomaly. Had Mr. Miller or Lorenz Ranch raised the statute of frauds as a defense and not fully performed the agreement, the Cash plaintiffs would not own any property in the Granite Springs Retreat, Second Filing, and would not have an interest to litigate. It is, therefore, ironic that they are arguing at this point that Mr. Miller did not have an equitable interest in the property by virtue of the oral agreement with Lorenz Ranch.

[¶ 22] We addressed a similar situation in *Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC,* 2010 WY 82, 239 P.3d 382 (Wyo.2010). In that case, we recognized that the purpose of the statute of frauds is to "give to the party to a

... contract, against whom the enforcement of the contract is sought by the other party, the right to assert the statute as a defense to his or her own liability." *Id.*, ¶ 33, 239 P.3d at 392, quoting 10 Richard A. Lord, *Williston on Contracts* § 27:12 (4th ed. 1999). Neither Lorenz Ranch nor Mr. Miller sought to use the statute of frauds as a defense to liability and, in fact, they fully performed. While generally privies to a contracting party may assert the statute of frauds defense, that is not the case after the contract has been fully performed by the contracting parties. The successors (the Cash plaintiffs) have only the rights which belonged to their predecessor (Miller). *Id.*, ¶ 36, 239 P.3d at 392. Since their predecessor did not raise the statute of frauds as a defense, it is not available to them. *Id.* Using the statute of frauds to disavow an agreement that actually gave rise to the very interest they are seeking to protect would be an improper use of the legal principle.

[¶ 23] The second element for an equitable servitude to be imposed is the developer intended that the covenants be binding upon subsequent purchasers of the second filing tracts. Cash argues that, because the declaration of protective covenants does not appear in the chain of title of the second filing properties, the covenants could not encumber the properties. This argument misses the entire point of equitable servitudes. An equitable servitude imposes a restriction on land even though it does not technically encumber or run with the land. The imposition of the restriction is based upon the concept that a purchaser took the property with notice of a common scheme or plan. As we stated in *Bowers Welding*, 699 P.2d at 303, if the purchaser has notice of an agreement containing restrictions, "it is not material that the agreement is not of record." *See also, Hein v. Lee*, 549 P.2d 286, 292 (Wyo.1976) (stating that "[n]either the fact that they [restrictive covenants] do not appear in his deed nor the fact that they are not properly placed on public record relieves the appellant of [his] burden because he had actual notice").

[¶ 24] In determining Miller's intent with regard to the subdivision, we start with the language of the covenants. The covenants were titled: "Granite Springs Retreat at Happy Jack Road and Curt Gowdy State Park[,] Cheyenne, Wyoming 82001[,] Declaration of Protective Covenants." The title indicated that the covenants would apply to the entire Granite Springs Retreat development, not just to the first filing property. The actual provisions included in the covenants also contemplated application to both filings. The ACC provision stated that, at first, the developer would appoint the members of the ACC, but once ten dwellings were complete, the ACC members would be elected by the lot owners. The first filing only included eight tracts; consequently, the ACC provision obviously contemplated inclusion of the second filing property when it discussed the ten dwelling requirement. It is also significant that some of the common areas referred to in the covenants, like the green belt streams and lakes, are located on second filing property. In *Bowers Welding*, 699 P.2d at 305, we stated that, because the covenants referenced features within the property that was inadvertently omitted from the description of covered property, the developer obviously intended to impose the restrictions on that property, as well. Thus, the declaration of protective covenants, itself, confirms that Mr. Miller intended for the covenants to apply to the entire Granite Springs Retreat subdivision, including both filings.

[¶ 25] The district court also looked to other documents in concluding that Mr. Miller intended the entire Granite Springs Retreat subdivision be developed according to a common plan or scheme. Cash argues that, in searching for the developer's intent, we are restricted to the language of the covenants. If that is true, then as we just pointed out, the intent expressed in the clear language of the covenants was to bind the second filing properties.

[¶ 26] However, in *Bowers Welding*, 699 P.2d at 303, we stated: "A common way in which to uphold restrictive covenants is to find a general plan or scheme for the development of a tract of land." The search for a common scheme or plan often involves looking beyond the language of the covenants

which were not correctly placed of record. For example, in *Bowers Welding*, 699 P.2d at 305, we considered the "character of use made of all the lots open to a view of the [defendant] when he purchased" his property, *Sanborn v. McLean*, 233 Mich. 227, 206 N.W. 496 (1925) and statements made by the developer to the purchaser, *Hein*, 549 P.2d at 292. We also quoted 20 Am.Jur.2d *Covenants, Conditions, and Restrictions*, § 177 (1965) as indicating that a purchaser will be bound by the common scheme or plan created by the grantor's maps and plans showing the division of the property into tracts so long as the purchaser takes the property with notice of the plan.

[¶ 27]  In this case, the preliminary plat included all of the Granite Springs Retreat property, both first and second filings, and the application for subdivision filed with Laramie County indicated that the subdivision would be known as Granite Springs Retreat and would include sixty lots. In addition, the environmental impact report stated that the entire development would be burdened by the covenants. The undisputed evidence establishes that Mr. Miller intended that the second filing properties be bound by the protective covenants.

[¶ 28]  We turn now to the third element required for imposition of equitable servitudes—notice to the subsequent purchasers. Notice is at the heart of the rationale behind enforcement of equitable servitudes. We provided an extensive discussion of the notice requirement in *Bowers Welding*, 699 P.2d at 303:

"The notice of restrictions sufficient to charge a purchaser may be actual notice or notice of facts sufficient to put him on inquiry. For instance, the notice sufficient to charge a purchaser of a lot in a subdivision with knowledge of restrictions imposed in deeds to other lots as part of a general plan, but inadvertently or otherwise omitted from the deeds in his chain of title, may be actual or constructive, including notice of facts which ought to have put him on inquiry, such as the uniform appearance of the area in which the lot is located. * * * *"

"If the purchaser has actual notice of an agreement containing restrictions, it is not material that the agreement is not of record. At least, where it does not appear that the agreement was of record, the purchaser with actual notice has been held bound by the restrictions. Even notice of a parol agreement binds the purchaser to comply with the restrictions." 20 Am.Jur.2d, Covenants, Conditions, and Restrictions, §§ 307–308, pp. 871–872 (1965).

As we discussed in the context of the second equitable servitude element, inquiry notice may be established by a common scheme or plan for development. *Id.* at 303–05.

[¶ 29]  We will address the plaintiffs separately in determining whether they had notice of the covenants.[2]  Mr. Cash purchased his second filing lot in 1992, after the homeowners' association had already been formed. Mr. Cash's chain of title included an affidavit of intention recorded in 1983 in which Mr. Miller stated that he intended for the covenants to apply to the entire Granite Springs Retreat subdivision. That document put him on notice of the covenants.

[¶ 30]  In addition, Mr. Cash admitted that he looked at several lots before deciding on one, so he obviously knew that he was purchasing in a planned development. He also stated that he received a copy of the amended covenants[3] when he purchased his property;  although, in a later affidavit he

2.  This analysis does not apply to Plaintiffs Nelson and Hilliker. Their property is located in the first filing and they do not argue that the covenants do not bind them. Mr. Nelson and Ms. Hilliker participated in this action because they were concerned that if the second filing properties were found to be bound by the protective covenants, they would be required to help pay for maintenance, etc. in the second filing area. The covenants, plats, etc. gave the first filing property purchasers actual notice that the covenants bound the entire subdivision.

3.  The plaintiffs argue that the notice provided by the amended covenants was insufficient because those covenants were later declared to be invalid. We disagree. The amended covenants obviously "amended" a prior version. When the plaintiffs were provided with notice of the amended covenants, together with the other documents in this case, they were certainly put on notice to inquire about other restrictions.

stated that he did not receive the amended covenants until after he closed on his property.

[¶ 31] Mr. Cash participated in numerous activities over the years which indicated he was aware of the covenants. In particular, he sought ACC approval for construction of various improvements on his property, and he even served on the ACC for a time. He did not contest the existence of the restrictions imposed by the covenants for several years after he purchased his property. Without question, Mr. Cash had notice of the existence of the restrictions on his property when he purchased it.

[¶ 32] Mr. Maturi also purchased his property after Mr. Miller filed his affidavit indicating that he intended for the covenants to bind the entire Granite Springs Retreat development. Mr. Maturi's real estate agent advised him that there was a homeowners association for the subdivision. As the district court noted, the fact that a homeowners association existed should have alerted Mr. Maturi to the possibility of covenants. Mr. Maturi did not contest the existence of the covenants for several years after he purchased his property and, in fact, he served a three year term on the board of the homeowners association. There is simply no question that he was on notice when he purchased the property that it may be subject to land use restrictions.

[¶ 33] Mr. and Mrs. McCune purchased their property in 1978, meaning that Mr. Miller's affidavit of intention was not part of their chain of title. They claim they did not receive notice of the covenants until after they purchased their property. However, they were aware they were purchasing a lot in a planned development, as that was clear from their deed and other documents in their chain of title. Mr. and Mrs. McCune were actively involved in forming the homeowners association and other aspects of subdivision governance for many years. Mr. McCune stated that he and Mr. Miller "cre-

ated" the GSRA. The McCunes also sought ACC approval for the construction of their home. It seems incredible that they would undertake those responsibilities if, as they now argue, they were not aware of the covenants. Under the facts of this case the McCunes were, at the very least, charged with inquiry notice of the existence of restrictions on their land. It would be particularly inequitable to relieve them of the burden of the covenants under the facts of this case.[4] *Streets,* 898 P.2d at 380, citing *Hein,* 549 P.2d at 292.

## CONCLUSION

[¶ 34] All of the elements for imposition of equitable servitudes upon the Granite Springs Retreat, Second Filing properties are met in this case. The district court properly ruled that Mr. Miller had equitable title to the property when he recorded the declaration of protective covenants, he intended to burden the entire development with the covenants, and the plaintiffs purchased their lots with notice of the covenants. The district court's order granting summary judgment in favor of GSRA and the other defendants is affirmed.

---

4. The district court also ruled that the plaintiffs were barred by the doctrine of laches from contesting the validity of the covenants because they "not only acquiesced to the covenants for years but each actively participated at some point in the [ACC] or some other facet of the" GSRA. The plaintiffs claim this ruling was in error. We do not need to address the laches rationale because our other rulings are dispositive.